Irma SCHOCK, individually and as Guardian of the property of Anna Dever; Woldemar Schock, Amelia N. Schock and Angelina Minutola, Defendants–Below, Appellants,

v.

James V. NASH, Administrator with the Will annexed of the Estate of Anna M. Dever; and Thomas Jefferson University, Plaintiffs–Below, Appellees.

No. 374, 1998.

Supreme Court of Delaware.

Submitted: May 17, 1999.[1]

Decided: June 16, 1999.

Rehearing Denied July 16, 1999.

---

Victor F. Battaglia (Argued), and Philip B. Bartoshesky, Biggs & Battaglia, Wilmington, for Irma Schock.

Thomas Herlihy, III, Herlihy Harker & Kavanaugh, Wilmington, for Woldemar Schock, Amelia N. Schock and Angelina Minutola.

Charles E. Butler, Smith Katzenstein & Furlow, Wilmington, and Thomas H. Suddath, Jr. (Argued), Montgomery, McCracken, Walker & Rhoads, Philadelphia PA, for Thomas Jefferson University and James V. Nash.

Before VEASEY, Chief Justice, WALSH, HOLLAND, HARTNETT and BERGER, Justices (constituting the Court en Banc).

HARTNETT, Justice.

In this appeal, we affirm the Court of Chancery's decision, after trial, that imposed a constructive trust and awarded restitution as to certain property of Anna M. Dever. The Court of Chancery found that the evidence was not sufficient to show that Ms. Dever intended that the durable power of attorney she executed authorized Irma Schock, the named attorney-in-fact, to make gratuitous transfers of Ms. Dever's property to Irma and her family. We hold that Irma breached her fiduciary duty of loyalty and AFFIRM.

## I. Facts and Procedural History

This action arises from a dispute as to the ownership of Anna M. Dever's property that, prior to her death, was transferred by her attorney-in-fact, Irma Schock, to herself and her family. If not so transferred, the property would have passed to Thomas Jefferson University under Dever's will.

Anna Dever and Irma Schock were neighbors and first became friends in the late 1980s when Andrew Schock, who was Irma's son and Ms. Dever's paperboy, invited Anna Dever to dinner. At the time of the introduction, Ms. Dever was a single elderly woman with no close family of her own. She subsequently, regularly attended Sunday meals at the Schock's home. The Schocks assisted Ms. Dever in various ways, such as making minor house repairs and shopping. On several occasions the Schock family aided Ms. Dever by getting her medical treatment when they found her in her home unconscious as a consequence of her diabetes. Irma Schock also assisted Ms. Dever with her financial affairs.

On September 17, 1994, Ms. Dever executed a Durable Power of Attorney ("the 1994 POA")[2] on a printed form prepared

2. The execution of a durable power of attorney is authorized by the Delaware version of

by Wilmington Trust Company.[3] It was a general grant of authority and listed powers in six numbered paragraphs.[4] It also included an unnumbered paragraph that stated:

In consideration of the recognition of this Power of Attorney by said Wilmington Trust Company, and intending to be legally bound hereby, I/we hereby agree as follows: If said Attorney shall perform any act or acts herein authorized, after my/our death, bankruptcy, or the occurrence of any legal disability on my/our part (whether or not a decree has been issued), such act or acts shall be binding upon my/our personal representatives and my/our guardians, if any; I/we also agree, for my/our personal representatives assignees and guardians, if any, to indemnify and save harmless said Wilmington Trust Company from any loss or damage which it might sustain through relying upon the apparent authority of this power after its termination, by operation of law or otherwise; I/we do hereby expressly authorize and empower Wilmington Trust Company to permit my/our said Attorney to deal with, control, transfer to the name of said Attorney, or to the name of others, appropriate to his or her own use or to the use of others, and dispose of, any and all moneys, funds, accounts, Checks, Drafts, Notes, Bills of Exchange, other commercial paper, Certificates of Deposit or other Orders or instruments for the payment of money, bonds, stocks, and other securities, or any and all other property whatsoever, tangible or intangible, which may belong to me/us or in which I/we may have any interest, to the same full and unlimited extent and in the same manner as my/our said Attorney might or could do, if the same were his or her absolute property, hereby expressly authorizing my/our said Attorney to deposit my/our funds in his or her personal account, and I/we agree that Wilmington Trust Company shall not in any manner or for any cause be liable for any disposition which my/our said Attorney may make of the same or any part thereof.

Irma Schock, the named attorney-in-fact, claims this paragraph gave her the power to gratuitously transfer substantially all of Ms. Dever's property to herself. At the time she executed the power of attorney, Ms. Dever also changed the name on her individual checking account in Wilmington Trust Company to "Anna Dever and Irma Schock as joint tenants with right of survivorship."[5] As will be discussed, before Ms. Dever's death, Irma Schock transferred most of the principal's property to herself or her family. This led to this suit being filed by the University and James V. Nash, the Administrator of the estate of Anna M. Dever (collectively "the Plaintiffs"). The suit challenges transfers made by Irma Schock to herself and her family.

Plaintiffs named as defendants Irma Schock, individually and as Guardian of

the Uniform Durable Power of Attorney Act. 12 *Del.C.* Ch. 49.

3. A second general power of attorney was also executed on April 24, 1995 with Irma as the attorney-in-fact. This power of attorney was not in issue in the proceedings below because Irma claimed she derived all her authority to make the disputed transactions from the 1994 POA. *See Nash v. Schock,* Del. Ch., C.A. No. 14721–NC, 1997 WL 770706 (Dec. 3, 1997), Mem. Op. at 4 n. 2.

4. Paragraph one authorized the attorney-in-fact to "establish bank accounts and to make, draw, sign, issue and deliver Checks, Drafts, and other Orders, whether written or oral, by electronic or other means for the payment of money from any of my/our account(s) at Wilmington Trust Company including Checks or Orders to the order of cash or bearer or to the individual order of said Attorney." Paragraph five provided that the attorney-in-fact may "sell, transfer and do any other act concerning any stock, bonds, securities ... or other property that I/we may have or possess...." *See Id.* at 11–12.

5. The validity of the 1994 POA and the retitling of the bank account were not in issue at trial. *Id.* at 4. Thus, there was no objection to Irma retaining the balance in the bank account at the time of the death of Ms. Dever.

the property of Anna M. Dever, Woldemar Schock, Amelia Schock and Angelina Minutola[6] (collectively "the Schocks") alleging that Irma Schock breached the fiduciary duties she owed to Dever as her attorney-in-fact because she improperly made gratuitous transfers to herself and her family. Plaintiffs asserted that all the Schocks had been unjustly enriched and therefore hold the proceeds of the inappropriate transfers in constructive trust for the University's benefit.

Anna Dever's Last Will and Testament, executed in 1971, named the University as the residual beneficiary of her estate. It had been her and her parents' long-time wish to establish a scholarship for needy medical students. The will named Ms. Dever's now deceased mother as primary beneficiary and the University as a contingent beneficiary if her mother did not survive her. Evidence was offered at trial that Ms. Dever had considered changing her Will to make Irma and Woldemar Schock the primary beneficiaries of her estate. At trial, Babe Giacoma, Ms. Dever's long-time friend, testified that Anna retitled her bank account to facilitate Irma Schock's ability to handle her finances and to make a gift of any funds left in the account after her death to Irma. Ms. Giacoma also testified that in 1994, Ms. Dever had considered drafting a new will with Irma and Woldemar Schock as the primary beneficiaries. At that time Ms. Giacoma was an employee of the New Castle County Register of Wills Office and advised Ms. Dever that she could use a power of attorney and joint accounts with right of survivorship to dispose of her estate. Ms. Dever never formally changed her will, but did execute the 1994 POA without any advice from an attorney.

On May 10, 1995, Anna Dever was admitted to the hospital. Attorney John Weaver testified by deposition that he visited Ms. Dever on May 18, 1995 and she instructed him to draft a new will naming Irma and Woldemar Schock as the primary beneficiaries and the University as contingent beneficiary. On May 20, 1995, Ms. Dever slipped into a semi-conscious state and never formally changed her will. For purposes of this case, the parties agree that Ms. Dever lacked the legal capacity to manage her affairs after May 20, 1995.[7] Irma Schock was appointed guardian of Anna Dever's person and property by the Court of Chancery on August 11, 1995 after she discovered that Ms. Dever had two inconsistent "living wills." Anna M. Dever died on August 18, 1995.

The University was the sole beneficiary under Ms. Dever's unrevoked 1971 Will. Under the will, the University received Ms. Dever's home which was ultimately sold for approximately $108,000. The University alleges that the various transactions by Irma Schock reduced the assets in Ms. Dever's estate that it would have otherwise been entitled to receive as the sole beneficiary of her will. It is undisputed that after Ms. Dever became incapacitated, Irma liquidated all of Ms. Dever's stocks and a $5,000 Wilmington Savings Fund Society certificate of deposit and also transferred a $15,000 annuity from Great Northern Insured Annuity Corporation that named the University as beneficiary to a Penn Mutual annuity with Irma's daughter, Amelia, as the new beneficiary.

The proceeds from the stocks of Ms. Dever sold by Irma were approximately $144,722 and were placed into the Wilmington Trust joint bank account of Ms. Dever and Irma. Irma then wrote several checks and withdrew over $6,126.26 from this joint account to pay her personal and

6. Woldemar is Irma's husband, Amelia is her daughter and Angelina is Irma's mother.

7. Plaintiffs argued that Dever was incapacitated from May 20, 1995 until her death while Defendants assert that Dever had moments of lucidity. The trial court noted and the parties agreed that Dever's actual condition had no bearing on the disposition of this case. *Id.* at 5 n. 4.

family expenses.[8] Between June 6 and June 27, 1995, Irma used approximately $140,000 from the joint account to purchase mutual funds in the joint names of herself and Anna M. Dever. On August 23, 1995, five days after Ms. Dever's death, Irma changed the title on the mutual fund accounts to show that they were jointly owned by her and her mother, Minutola. Irma testified at trial that she caused the mutual funds to be titled jointly with herself and her mother, without Minutola's knowledge, in order to take advantage of a lower taxable income base. At trial the Plaintiffs asserted that Irma liquidated approximately $20,000 in the mutual funds and gave the money to her husband, Woldemar, to be used in his business.[9]

Amelia Schock received approximately $13,796 from the Penn Mutual annuity upon Dever's death. Amelia loaned that money to Woldemar Schock, her father, under the name of his business. It was used by Woldemar to purchase a 1994 Ford Thunderbird that Amelia took with her to college. Irma testified that the automobile was purchased under the business name in order to receive a lower insurance premium. Apparently no gift tax returns were ever filed concerning any of the property.

At trial the court reserved decision on plaintiff's motion in limine to preclude extrinsic evidence of Ms. Dever's intent when executing the 1994 POA but permitted plaintiffs to adduce the extrinsic evidence proffered for the record.[10] In its Memorandum Opinion dated December 3, 1997, the Court of Chancery found that Irma Schock had breached her fiduciary duties because the power of attorney did not authorize her to make gratuitous transfers of Dever's property to herself and her family.[11]

The court adopted a "bright line test" for determining whether an attorney-in-fact had the power to self-deal or make gratuitous transfers.[12] Because the court found that the power of attorney must expressly authorize such transfers, and the document in question did not, it found that it was unnecessary to decide the motion to exclude extrinsic evidence of Ms. Dever's intent.[13] It did state, however, that the result would not be changed by the extrinsic evidence.[14]

On June 11, 1998, the court entered a monetary *judgment* in favor of the plaintiffs, imposed a constructive trust on several items traceable as Ms. Dever's property, and ordered restitution.[15]

## II. Claims of Appellants

The Schocks contend that the Court of Chancery erred in interpreting the power of attorney as not allowing Irma Schock to make gratuitous transfers to herself and her family and for failing to consider the

---

**8.** Irma wrote a check in the amount of $4,366.36 to pay off a joint credit card in the names of Woldemar and Irma Schock, several checks totaling $859.40 for groceries and household goods, and withdrew cash in the amount of $400 in June and $500 in August 1995. *Id.* at 7; *Nash v. Schock*, Del.Ch., C.A. No. 14721–NC (June 11, 1998), Order at 2.

**9.** Later it was uncovered that Irma made additional loans to Woldemar for his businesses in the amount of $44,000. Woldemar asserts that the loans were made to two Delaware corporations: Kitchen and Bath Store, Inc. and Millwork Cabinet Shop, Inc. *See Nash v. Schock*, Del.Ch., C.A. No. 14721–NC, 1998 WL 474161 (July 23, 1998), Letter Op. at 2. Neither corporation has issued any stock, however, Woldemar is the manager and trea-

surer/secretary and Irma is "listed" as the president for both corporations. *Id.* at 2–3.

**10.** *Nash v. Schock*, Del.Ch., C.A. No. 14721–NC, 1997 WL 770706 (Dec. 3, 1997), Mem. Op. at 8.

**11.** *Nash v. Schock*, Del.Ch., C.A. No. 14721–NC, 1997 WL 770706 (Dec. 3, 1997) (Mem. Op.).

**12.** *Id.* at 10, 23.

**13.** *Id.* at 23.

**14.** *Id.* at 14–15.

**15.** *Nash v. Schock*, Del.Ch., C.A. No. 14721–NC (June 11, 1998) (ORDER).

extrinsic evidence of Anna M. Dever's intent. Woldemar, Amelia and Ms. Minutola also allege that the court erred as a matter of law in entering monetary judgments against each of them because it was inequitable and excessive. They also assert that if this court upholds the trial court's finding that Irma acted beyond her authority and that Angelina Minutola should not be dismissed from the case, the only appropriate remedy is an equitable lien against assets presently in the Schocks' possession that are traceable to Anna Dever. Additionally, Woldemar Schock asserts that the record does not support the finding that he aided and abetted Irma's breach of fiduciary duty and it was an error of law for the trial court to have directed him to make restitution because the funds he received were in the form of loans from Irma, that have already been partially repaid to her, and, therefore, he was not unjustly enriched.

## III. Standard and Scope of Review

■ In an appeal from the Court of Chancery's interpretation of a written agreement, we review conclusions of law *de novo*.[16] The trial court's factual findings, however, will be accepted "[i]f they are sufficiently supported by the record and are the product of an orderly and logical deductive process."[17] "To the extent the trial court's interpretation of [an agreement] rests on findings concerning extrinsic evidence, however, this Court must accept those findings unless they are unsupported by the record and are not the product of an orderly and logical deductive process."[18] When reviewing decisions based on live testimony of witnesses, determinations of credibility, and expert witness presentations, this Court affords the lower court's decision substantial deference.[19]

## IV. Fiduciary Duty Under a Power of Attorney

■ The creation of a power of attorney imposes the fiduciary duty of loyalty on the attorney-in-fact.[20] The issue raised in this appeal is whether the agent's fidu-

---

16. *Emmons v. Hartford Underwriters Ins. Co.*, Del.Supr., 697 A.2d 742, 744 (1997).

17. *Levitt v. Bouvier*, Del.Supr., 287 A.2d 671, 673 (1972).

18. *Sonitrol Holding Co. v. Marceau Investissements*, Del.Supr., 607 A.2d 1177, 1178–80 (1992).

19. *Cinerama, Inc. v. Technicolor, Inc.*, Del. Supr., 663 A.2d 1156, 1180 (1995); *Nixon v. Blackwell*, Del.Supr., 626 A.2d 1366, 1378 n. 16 (1993) ("This Court respects and gives deference to findings of fact by trial courts when supported by the record, and when they are the product of an orderly and logical deductive reasoning process, especially when those findings are based in part on testimony of live witnesses whose demeanor and credibility the trial judge has had the opportunity to evaluate.").

20. 3 Am.Jur.2d Agency § 210 (1986) (citing *Wadsworth v. Adams*, 138 U.S. 380, 11 S.Ct. 303, 34 L.Ed. 984 (1891); *Leather Mfrs. Nat. Bank v. Morgan*, 117 U.S. 96, 6 S.Ct. 657, 29 L.Ed. 811· (1886); *Manufacturers Casualty Ins. Co. v. Martin–Lebreton Ins. Agency*, 5th Cir., 242 F.2d 951 (1957), *cert. denied*, 355 U.S. 870, 78 S.Ct. 121, 2 L.Ed.2d 76 (1957); *Mallamo v. Hartman*, 70 Ariz. 294, 219 P.2d 1039 (1950); *McKinney v. Christmas*, 143 Colo. 361, 353 P.2d 373 (1960); *Town & Country House & Homes Service, Inc. v. Evans*, 150 Conn. 314, 189 A.2d 390 (1963); *Connelly v. Special Road & Bridge Dist. No. 5*, 99 Fla. 456, 126 So. 794 (1930); *Clyde Chester Realty Co. v. Stansell*, 151 Ga.App. 357, 259 S.E.2d 639 (1979); *Merchant v. Foreman*, 182 Kan. 550, 322 P.2d 740 (1958); *Shatz Realty Co. v. King*, 225 Ky. 846, 10 S.W.2d 456 (1928); *Doujotos v. Leventhal*, 271 Mass. 280, 171 N.E. 445 (1930); *Marchitto v. Central R.R. Co.*, 9 N.J. 456, 88 A.2d 851 (1952), *overruled on other grounds, Donnelly v. United Fruit Co.*, 40 N.J. 61, 190 A.2d 825 (1963); *United States Nat. Bank of Portland v. Guiss*, 214 Or. 563, 331 P.2d 865 (1958); *Sylvester v. Beck*, 406 Pa. 607, 178 A.2d 755 (1962); *Horne v. Holley*, 167 Va. 234, 188 S.E. 169 (1936); *Byars v. Stone*, 186 Va. 518, 42 S.E.2d 847 (1947); *Raymond v. Davies*, 293 Mass. 117, 199 N.E. 321 (1936); *Haswell v. Standring*, 152 Iowa 291, 132 N.W. 417 (1911); *Fort Valley Coca–Cola Bottling Co. v. Lumbermen's Mut. Casualty Co.*, 69 Ga.App. 120, 24 S.E.2d 846 (1943)); Uniform Durable Power of Attorney Act § 3 cmt. (1979).

ciary duty of loyalty was waived so as to have permitted her to self-deal or make gratuitous transfers to herself.

▄▄▄ Unlike corporate law[21] and limited partnership law[22] that provide statutory modifications to the common law of fiduciary duty, there is no statutory provision that alters the common law fiduciary duty of loyalty owed by an attorney-in-fact under a durable power of attorney.[23]

▄▄▄ The common law fiduciary relationship created by a durable power of attorney is like the relationship created by a trust.[24] The fiduciary duty principles of trust law must, therefore, be applied to the relationship between a principal and her attorney-in-fact. An attorney-in-fact, under the duty of loyalty, always has the obligation to act in the best interest of the principal unless the principal voluntarily consents to the attorney-in-fact engaging in an interested transaction after full disclosure.[25] At common law, transactions which violated the fiduciary duty of loyalty were void.[26] Under current Delaware law, these transactions are voidable at the be-

21. Although Delaware corporate law permits the waiver of liability for a breach of the common law duty of care that directors owe to a corporation and its stockholders by including a clear and unambiguous provision in the certificate of incorporation, it does not allow for a waiver of the directors' duty of loyalty. 8 *Del.C.* § 102(b)(7); *See Zirn v. VLI Corp.*, Del.Supr., 621 A.2d 773, 783 (1993). The statute does, however, provide corporate directors with a safe harbor from allegations of self-dealing if the transaction is approved by a majority of the informed and disinterested directors, or disclosed to and approved by the shareholders. 8 *Del.C.* § 144; *See, Stegemeier v. Magness*, Del.Supr., 728 A.2d 557, 562 (1999); *Oberly v. Kirby*, Del.Supr., 592 A.2d 445, 466–67 (1991). The corporate law does not eliminate claims for a breach of the fiduciary duty of loyalty, but under certain circumstances it shifts the burden of proof to the plaintiffs to prove the transaction was unfair. *See Cinerama, Inc. v. Technicolor, Inc.*, Del.Ch., 663 A.2d 1134 (1994), *aff'd*, Del.Supr., 663 A.2d 1156 (1995); *In re Wheelabrator Technologies, Inc. Shareholders Litig.*, Del.Ch., 663 A.2d 1194 (1995).

22. The duty of loyalty in a limited partnership can be modified by agreement because the statute which creates the limited partnership specifically provides for it. *See Sonet v. Timber Co.*, Del.Ch., 722 A.2d 319, 322–23 (1998) (discussing DRLPA expanding or restricting fiduciary duties in the partnership agreement); 6 *Del.C.* § 17–1101(d). Fiduciary duties are specifically incorporated into partnership law by the Delaware Uniform Partnership Law, 6 *Del.C.* § 1521(1), and apply to a general partner in an limited partnership. 6 *Del.C.* § 17–1105. *See also, In re Cencom Cable Income Partners, L.P. Litigation*, Del. Ch., C.A. No. 14634–NC, 1996 WL 74726 (Feb. 15, 1996) (Mem.Op.).

23. *See* 12 *Del.C.*, Ch. 49.

24. 3 Am.Jur.2d *Agency* § 210 (1986). "The fiduciary relationship existing between an agent and his principal has been compared to that which arises upon the creation of a trust, and the rule requiring an agent to act with the utmost good faith and loyalty toward his principal or employer applies regardless of whether the agency is one coupled with an interest, or the compensation given the agent is small or nominal or that it is a gratuitous agency." *Id.* (citing *Theis v. duPont, Glore Forgan, Inc.*, 212 Kan. 301, 510 P.2d 1212 (1973); *Marti v. Standard Fire Ins. Co.*, N.J.Ct. Err. & App., 127 N.J.L. 591, 23 A.2d 576 (1942); *In re Estate of Mehus*, N.D.Supr., 278 N.W.2d 625 (1979); *Dillman v. Hastings*, 144 U.S. 136, 12 S.Ct. 662, 36 L.Ed. 378 (1892); *In re Estate of Arbuckle*, 98 Cal.App.2d 562, 220 P.2d 950 (1950); *Cook County v. Barrett*, 36 Ill.App.3d 623, 344 N.E.2d 540 (1975); *McHaney v. McHaney*, 209 Ark. 337, 190 S.W.2d 450 (1945); *SNML Corp. v. Bank of North Carolina*, 41 N.C.App. 28, 254 S.E.2d 274 (1979)); Restatement (Second) of Agency § 387 cmt. b (1958) ("The agent's duty is not only to act solely for the benefit of the principal in matters entrusted to him (see §§ 388–392), but also to take no unfair advantage of his position in the use of information or things acquired by him because of his position as agents or because of the opportunities which his position affords.... His duties of loyalty to the interests of his principal are the same as those of a trustee to his beneficiaries."); Restatement (Second) of Trusts § 170 (1959).

25. *Stegemeier v. Magness*, Del.Supr., 728 A.2d 557, 562–65 (1999); Restatement (Second) of Agency §§ 387, 389–391 (1958).

26. *Stegemeier v. Magness*, Del.Supr., 728 A.2d 557, 563 (1999).

hest of the beneficiary.[27] Recently in *Stegemeier v. Magness,* we found that a transfer by the trustee to herself is voidable by the beneficiary unless the terms of the sale are approved by the court, the beneficiaries, or the grantor before the trustee took office.[28] If the transaction is challenged, the burden of persuasion to justify upholding the transaction is on the fiduciary.[29] Thus, Irma Schock and the other defendants had the burden to establish that Anna Dever consented to the gratuitous transfers to Irma and her family after full disclosure of all the facts. Anna Dever was incapacitated when the transactions occurred and is now deceased.

## V. Strict Construction of a Power of Attorney

◼ While a power of attorney is construed in accord with the rules for interpretation of other written instruments, it is "generally more strictly construed than ordinary contracts." [30] This is especially so where the authorized agent is given broad authority over all or much of the principal's property.[31] While a power of attorney is strictly construed, this Court, in a different context, has held that the accompanying circumstances including the relationship of the parties should be examined to determine the intent of the parties.[32]

27. *Id.* at 563.

28. *Id.* at 563.

29. *Id.* at 563–64; 3 Am.Jur.2d *Agency* § 210 (1986) ("In a transaction between principal and agent in which an agent obtains a benefit, a presumption arises against its validity which the agent must overcome. This presumption arises in cases in which the principal makes a gift as well as in other transactions.") (footnotes omitted).

30. *Realty Growth Investors v. Council of Unit Owners,* Del.Supr., 453 A.2d 450, 454–55 (1982) (construing power of attorney to contain a narrow grant of authority for the determination of a specific interest in the common elements of a condominium); Restatement (Second) Agency § 34 cmt. h (1958).

31. Restatement (Second) Agency § 390 cmt. c (1958) quoted in footnote 54 herein.

## VI. The Text of the Durable Power of Attorney

◼ A careful reading of the power of attorney at issue shows that the alleged authority of Irma Schock to gratuitously convey trust property to herself and her family is not set forth. The trial court correctly found that the power of attorney "contains no language from which this Court could find a clear expression of Dever's intent to waive the fiduciary duty of loyalty implied by law, which would permit Schock to make gratuitous transfers." [33] We agree. The trial court applied a heightened scrutiny standard of review because the power of attorney in question was a pre-printed form, would require a liberal reading of the instrument to find the alleged authority, and such a reading would be inconsistent with the formal expressions of the principal's valid Last Will and Testament.[34] While heightened scrutiny is unnecessary here, we agree that the use of a pre-printed form is a factor that may be considered by a trial court in determining the intent of the parties.[35]

The ultimate issue before us is whether the unnumbered paragraph in the power of attorney clearly expressed Ms. Dever's intent to allow Irma Schock to make gratuitous transfers to herself. The relevant language relied on by Irma Schock (in emphasis) reads:[36]

32. *Realty Growth Investors v. Council of Unit Owners,* 453 A.2d at 455 ("The authorization of an agent is interpreted in light of the accompanying circumstances, including the relationship of the parties, general usage, and the method of doing business."); Restatement (Second) Agency § 34 cmt. h (1958).

33. *Nash v. Schock,* Mem. Op. at 11.

34. *Id.* at 12–15.

35. *See Realty Growth Investors v. Council of Unit Owners,* 453 A.2d 450; Restatement (Second) Agency § 34 cmt. h (1958).

36. The portions of the paragraph relied upon in this appeal by Irma Schock have been italicized. *Nash v. Schock,* Mem. Op. at 12–13.

I/we do hereby expressly authorize and empower Wilmington Trust Company to permit my/our said Attorney to *deal with, control, transfer to the name of said Attorney, or to the name of others, appropriate to his or her own use or to the use of others, and dispose of,* any and all moneys, funds, accounts, Checks, Drafts, Notes, Bills of Exchange, other commercial paper, Certificates of Deposit or other Orders or instruments for the payment of money, bonds, stocks, and other securities, or any and all other property whatsoever, tangible or intangible, which may belong to me/us or in which I/we may have any interest, to the same full and unlimited extent and in the same manner as my/our said Attorney might or could do, if the same were his or her absolute property, hereby expressly authorizing my/our said Attorney to deposit my/our funds in his or her personal account, and I/we agree that Wilmington Trust Company shall not in any manner or for any cause be liable for any disposition which my/our said Attorney may make of the same or any part thereof.[37]

The trial court found that the language relied upon by Irma Schock did not give her unlimited power to dispose of Ms. Dever's property for Irma's own benefit but "merely authoriz[ed] Wilmington Trust Company to permit the attorney-in-fact to take administrative actions as if the accounts were hers alone even if those actions exceed[ed] her authority, without recourse to Wilmington Trust Company."[38] The trial court concluded "[t]he purpose of this unnumbered paragraph is to protect Wilmington Trust Company from claims by the principal that the bank improperly allowed the attorney-in-fact to make transactions beyond the scope of the powers granted in the first six paragraphs; it is not to protect the principal or the attorney-in fact."[39] We agree.

The power of attorney, if read literally, states that Wilmington Trust Company is authorized to permit Irma, the attorney-in-fact, to do an illegal act: to commit a breach of her fiduciary duty of loyalty by appropriating to her own use assets subject to the power. Because such a reading would implicate Wilmington Trust Company in the breach of a fiduciary duty, it is doubtful if that was the intent.[40]

Although the power of attorney may contain other ambiguities, we find, as a matter of law, that the instrument is clear and unambiguous in that it does not authorize the disputed transfers. Even assuming, arguendo, that Ms. Dever could waive the fiduciary duty of loyalty owed to her by Irma, the power of attorney, by its terms, is clearly not a consent by Ms. Dever for Irma to breach her fiduciary duty of loyalty or a waiver of Ms. Dever's right to void the transfer. Nor is there any creditable evidence that Irma Schock ever informed Ms. Dever of her intentions to convey Ms. Dever's property to herself during Ms. Dever's life time.

## VII. Bright Line Rule

The Court of Chancery adopted a "bright line" rule as the rationale for its decision. While the use of such a rule may have some merit in reviewing powers of attorney such as the one before us, it appears to be inconsistent with this Court's holding in *Realty Growth Investors v. Council of Unit Owners*.[41] We there noted that powers of attorney are strictly construed but that the surrounding circumstances may be taken into consider-

37. *Id.* The language reflects that the bank, in preparing the durable power of attorney, was more interested in protecting itself than the assets of Ms. Dever.

38. *Id.* at 13.

39. *Id.* at 13–14.

40. *See Mills Acquisition Co. v. Macmillan, Inc.,* Del.Supr., 559 A.2d 1261, 1284 n. 33 (1989).

41. Del.Supr., 453 A.2d 450 (1982).

ation.[42] In *Realty Growth*, the power of attorney was quite different from the power of attorney at issue here. It was executed in connection with a limited partnership formed to hold title to a condominium, was for the limited specific purpose of determining the areas of common ownership in the condominium, and did not involve any gratuitous transfers by the attorney-in-fact.[43] Despite that its facts have limited relevance to the present matter, its rule of law is sound and, while the use of the "bright line" rule in the present case would lead to the same result reached by us, its use in a future case might unduly restrict the traditional ability of the Court of Chancery to consider all the facts and circumstances involved.

In adopting the "bright line" or "flat rule", the trial court relied on case law[44] from Hawaii,[45] South Carolina,[46] Iowa,[47] North Carolina,[48] Texas,[49] and Washing-

ton.[50] In *Kunewa v. Joshua*, the Intermediate Court of Appeals of Hawaii recognized that several other jurisdictions have adopted a similar rule, such as Alaska, New York, and Florida.[51] The court in *Kunewa v. Joshua* stated:

> [w]here a power of attorney does not expressly authorize the attorney-in-fact to make gifts to himself or herself, extrinsic evidence of the principal's intent to allow such gifts is not admissible. An attorney-in-fact may not make a gift to himself or herself unless there is clear intent in writing from the principal allowing the gift. Oral authorization is not acceptable.[52]

The "bright line" rule as it has been applied by most courts is not inconsistent with the traditional rule of trust law that a fiduciary's transfer to herself of trust property is voidable by the beneficiary un-

---

42. *Id.* at 455.

43. *Id.*

44. *See Nash v. Schock*, Mem.Op. at 10 n. 9–11.

45. *Kunewa v. Joshua*, App., 83 Hawai'i 65, 924 P.2d 559, 565–66 (1996).

46. *Fender v. Fender*, 285 S.C. 260, 329 S.E.2d 430 (1985).

47. *In re Estate of Crabtree*, Iowa Supr., 550 N.W.2d 168, 170 (1996).

48. *Whitford v. Gaskill*, 345 N.C. 475, 480 S.E.2d 690, 692 (1997) *amended by* 345 N.C. 762, 489 S.E.2d 177 (1997).

49. *F.M. Stigler, Inc. v. H.N.C. Realty Co.*, Tex. Ct.App., 595 S.W.2d 158, 161 (1980), *rev'd by Land Title Co. of Dallas, Inc. v. F.M. Stigler, Inc.*, 609 S.W.2d 754 (1980).

50. *Bryant v. Bryant*, 125 Wash.2d 113, 882 P.2d 169, 172 (1994).

51. *Kunewa v. Joshua*, 924 P.2d at 565.

52. *Id.* The court *in Kunewa* cited the policy reasons articulated in *Estate of Casey v. Comm'r of Internal Revenue*, 4th Cir., 948 F.2d 895, 898 (1991):

> [w]hen one considers the manifold opportunities and temptations for self-dealing that are opened up for persons holding general powers of attorney—of which outright transfers for less than value to the attorney-in-fact [himself] or herself are the most obvious—the justification for such a flat rule is apparent. And its justification is made even more apparent when one considers the ease with which such a rule can be accommodated by principals and their draftsman.

*Kunewa v. Joshua*, 924 P.2d at 565. It should be noted however, that the Fourth Circuit Court in *Casey* was speculating what rule the Virginia Supreme Court would adopt and later in another case it rejected the "bright line" rule noting that the Virginia Legislature had passed a statute which expressly rejected the flat rule and stating that the intent is found by examining the entire instrument and the surrounding circumstances. *See Estate of Ridenour v. Comm'r of IRS*, 4th Cir., 36 F.3d 332 (1994). Alabama also has a well criticized statute which "create[s] a presumption that gifts, even under the most general grants of power to the attorney-in-fact will be valid." *See also*, Hans A. Lapping, *License to Steal: Implied Gift–Giving Authority and Powers of Attorney*, 4 Elder L.J. 143, 167 (1996). Another court suggests a flat rule may be appropriate in the business setting but is not in a family relationship. *See Estate of Antone v. Staphos*, Conn.Super., No. CV93–0526844, 1994, WL 669694, at 5, Corradino J. (Nov. 17, 1994).

less the transfer is approved by the court, consented to by the settlor in advance, or consented to by the beneficiary affected after full disclosure.[53] Here the settlor and beneficiary are the same. The power of attorney she exercised does not unambiguously authorize the transfers nor could it constitute a valid consent because a consent or waiver requires "the voluntary relinquishment of a known right."[54] "It implies knowledge of all material facts and intent to waive."[55] There is nothing in the language of the power of attorney that indicates that Anna Dever ever knew of or consented to the specific transfers or waived her right to void them.

■ Additionally, when there is a close confidential relationship, as there was here, because Ms. Dever would naturally have relied on Irma Schock for advice, mere disclosure by Irma of her self-interest would not be enough. Irma had a duty to see that Ms. Dever received impartial advice based upon a carefully formed judgment.[56] Because this dispute involved the gratuitous transfer of essentially all of Ms. Dever's personal property, before her death, and the record is devoid of any advice by a competent and disinterested third person, it is clear that Irma Schock did not fulfill her fiduciary duty of loyalty to Ms. Dever.[57]

■ If the grantor's intent is the primary concern in interpreting a durable power of attorney,[58] a bright line rule might not always serve the interest of justice, especially if a printed form of a durable power of attorney prepared by a bank is used. Where there are concerns of abuse by an attorney-in-fact because of self-dealing or taking advantage of the elderly, our current law is better able to protect those interests. A power of attorney is strictly construed and broad all-embracing expressions are discounted or discarded.[59] Any admissible extrinsic evidence must be carefully considered by the trial court so that it may determine that it was indeed the intent of the principal to make a gift or consent to a strictly enumerated act of self-dealing after receiving

**53.** *Stegemeier v. Magness*, Del.Supr., 728 A.2d 557, 563 (1999).

**54.** *Klein v. American Luggage Works, Inc.*, Del. Supr., 158 A.2d 814, 818 (1960) ("[Waiver] implies knowledge of all material facts and of one's rights, together with a willingness to refrain from enforcing those rights."); *Standard Accident Insurance Co. v. Ponsell's Drug Stores, Inc.*, Del.Supr., 202 A.2d 271, 274 (1964).

**55.** *Realty Growth Investors v. Council of Unit Owners*, 453 A.2d at 456.

**56.** Restatement (Second) of Agency § 390 cmt. c (1958) ("The agent must not take advantage of his position to persuade the principal into making a hard or improvident bargain. If the agent is one upon whom the principal naturally would rely for advice, the fact that the agent discloses that he is acting as an adverse party does not relieve him from the duty of giving the principal impartial advice based upon a carefully formed judgment as to the principal's interests. If he cannot or does not wish to do so, he has a duty to see that the principal secures the advice of a competent and disinterested third person. An agent who is in a close confidential relation to the principal, such as a family attorney, has the burden of proving that a substantial gift to him was not the result of undue influence."); *In re Estate of Surian*, Del.Ch., C.A. No. 9754–NC, 1990 WL 100794 (July 12, 1990), Mem. Op. at 4–7; *Swain v. Moore*, Del.Ch., 71 A.2d 264, 267–68 (1950); *accord Robert O. v. Ecmel A.*, Del.Supr., 460 A.2d 1321 (1983).

**57.** Restatement (Second) of Agency § 390 cmt. c (1958); *In re Estate of Surian*, C.A. No. 9754–NC, Mem.Op. at 4–7; *Swain v. Moore*, 71 A.2d at 267–68.

**58.** *E.I. duPont de Nemours v. Shell Oil Co.*, Del.Supr., 498 A.2d 1108, 1113 (1985).

**59.** Restatement (Second) Agency § 34 cmt. h (1958); *See also, King v. Bankerd*, 303 Md. 98, 492 A.2d 608, 611–12 (1985) (holding that agent could not give away the principal's property unless that power was expressly given, arose as a necessary implication from conferred powers, or was clearly intended by the parties as evidenced by the surrounding facts and circumstances); *Kunewa v. Joshua*, App., 83 Hawai'i 65, 924 P.2d 559, 566 (1996) (holding that broad, all-encompassing grants of power to the agent must be discounted).

a full disclosure of all the facts.[60] The trial court can consider the witnesses' credibility and possible bias or self interest. Adopting a bright line rule might preclude a court from carefully considering all the surrounding circumstances to the detriment of the principal.[61] Although a few states have adopted a "bright line" rule, we decline to do so. We are not convinced that it is superior to our existing law and it might result in an injustice, where, for example, the power of attorney on its face did not disclose that inadequate disclosures were made to the principal.

## VIII. Admissibility of Extrinsic Evidence

 The Schocks contend that the Court of Chancery improperly failed to consider extrinsic evidence because the document was ambiguous. We have held that the power of attorney is not ambiguous as to the issue of whether it granted Irma authority to make gratuitous transfers to herself. Even if it was ambiguous, this would not help the Schocks because the trial court noted that even if it considered the extrinsic evidence it would not change the result.[62] We agree.

Assuming, arguendo, that the power of attorney was ambiguous, several factors support the trial court's decision that the extrinsic evidence, if considered, would not have shown that Dever intended that the 1994 POA allow Irma Schock to make unlimited gratuitous transfers to herself and her family. First, the 1994 POA was on a pre-printed form prepared by Wilmington Trust Company and there is no evidence that Ms. Dever received any competent independent advice as to its meaning. Second, all of the transactions in question took place after Dever became incapacitated and she could therefore not have ratified them. Third, while Dever's conversation with Attorney Weaver may have shown that she intended to change her will to provide that after her death the bulk of her estate would go to Irma and Woldemar, if they survived her, this conversation occurred over a year after the 1994 POA was signed and does not establish her intent at the time she executed it.[63] Nor does it show she intended to make a gift of substantially all her property to Irma Schock during her lifetime. Fourth, while Dever changed the title of her account with Wilmington Trust Company to show that it was to be held jointly with Irma Schock with right of survivorship, she took no action to change the title of her other property. Fifth, the conversation Ms. Dever had with Ms. Giacoma indicates that Giacoma's advice to Dever, to put her property in joint accounts with right of survivorship so as to dispose of her property outside of her will, was done primarily for Ms. Dever's convenience and for her concern that her bills were paid. Sixth, Dever did not destroy or revoke her 1971 will which left the bulk of her estate to the University. Seventh, there is no creditable evidence Irma Schock ever told Ms. Dever that she intended to transfer any of Ms. Dever's assets to herself. Eighth, there is no creditable evidence that Ms. Dever ever intended for the Schocks to receive any of her property before her death. Finally, and most persuasive, is the trial court's determination of Irma Schock's credibility: it is clear from the record that the trial court did not believe her testimony and criticized her for

**60.** Another jurisdiction requires clear and convincing evidence as an alternative to adopting a bright line rule. *See Estate of Antone v. Staphos,* Conn.Super., No. CV93–0526844, 1994 WL 669694, Corradino, J. (Nov. 17, 1994).

**61.** See *Estate of Ridenour v. Comm'r of IRS,* 4th Cir., 36 F.3d 332 (1994); *Arst v. Stifel, Nicolaus & Co.,* 10th Cir., 86 F.3d 973, 979 (1996) (holding "the existence of an implied fiduciary relationship 'depends on the facts and circumstances of each individual case' "); *Johnson v. Fraccacreta,* Fla.Dist.Ct.App., 348 So.2d 570 (1977).

**62.** *Nash v. Schock,* Mem.Op. at 14–15.

**63.** *See Eagle Indus. Inc. v. DeVilbiss Health Care, Inc.,* Del.Supr., 702 A.2d 1228 (1997).

what it perceived as egregiously taking advantage of an elderly and dependent person. Even if we found the power of attorney was ambiguous, the Court of Chancery's findings are supported by the record, are based on live testimony of witnesses and determinations of credibility, and therefore, must be affirmed.

## IX. Remedies

The trial court imposed a constructive trust on the following: $5,000 proceeds of a certificate of deposit; $4,366.36 paid from the joint account of Irma and Ms. Dever used to pay the personal debts of Woldemar and Irma Schock; $5,000 from the same joint account used to make a loan to Woldemar Schock's business; Mutual funds accounts held by Irma and Minutola; and a 1994 Ford Thunderbird in the possession of Amelia Schock.[64] The total monetary judgment entered against Irma Schock was $174,644.12 and the court ordered her to submit an accounting to the court of all funds distributed by her as Ms. Dever's guardian. The trial court ordered restitution in the following amounts: Woldemar Schock—$73,366.36;[65] Amelia Schock—$13,796;[66] and Angelina Minutola—$154,194.[67] The trial court ordered that all the family members were jointly and severally liable with Irma Schock for the amounts assessed against them individually.[68]

On June 18, 1998, Woldemar Schock, Irma's husband, moved, pursuant to Court of Chancery Rule 59(e), for a modification of the June 11, 1998 Order or in the alternative requesting reargument. In a letter opinion dated July 23, 1998, the trial court denied this motion.[69] The court noted "the record appears quite clear that Woldemar knowingly aided and abetted his spouse's breach of fiduciary duty and became unjustly enriched as a result."[70]

On July 22, 1998, Plaintiffs moved to transfer the judgment to Superior Court. The Schocks filed their response to the motion and moved to stay discovery in aid of execution. Woldemar Shock and Angelina also filed a motion to modify the trial court's order on July 30, 1998. On August 12, 1998, the trial court denied the Schocks' motion to stay discovery and ordered that discovery in aid of execution proceed.

On August 20, 1998, the Schocks filed a Notice of Appeal with this Court. On September 21, 1998, Angelina Minutola moved to stay her scheduled deposition and the trial court denied that motion. On September 24, 1998, a conference was held with the parties, where the trial court announced it would not rule on the July 30, 1998 motion to modify due to the pending appeal. On September 25, 1998, the trial court granted the Plaintiffs' request to transfer judgment to the Superior Court.

The trial court correctly found that all the Schocks were unjustly enriched and ordered them to return any assets in their possession that were traceable to Irma

---

**64.** *Nash v. Schock*, Del.Ch., C.A. No. 14721–NC (June 11, 1998), Order at 2.

**65.** This amount included a $5,000 loan made by Irma Schock from the joint account, $20,000 for a loan made by Irma Schock from the brokerage account; $44,000 in other loans made by Irma Schock, and $4,366.36 for sums paid for joint liabilities of Irma and Woldemar. *Id.* at 2.

**66.** This amount was for the cost of the 1994 Ford Thunderbird purchased with the proceeds of an annuity held with Penn Mutual. *Id.* at 3.

**67.** This amount was for the $140,398 of the brokerage account which was jointly titled in Irma Schock and Minutola's names and $13,796 used to purchase the automobile for Amelia from a mutual fund held jointly with Irma. *Id.* at 3.

**68.** *Id.*

**69.** *Nash v. Schock*, Del.Ch., C.A. No. 14721–NC, 1998 WL 474161 (July 23, 1998) (Letter Op.).

**70.** *Id.* at 2.

Schock's breaches of fiduciary duty.[71] The court later ordered that all the Schocks pay restitution in the amounts that they were individually unjustly enriched.[72]

The Schocks assert that the trial court erred as a matter of law in imposing a constructive trust and ordering them to pay restitution to the University because it should have imposed only an equitable lien on the property. They also assert that absent a finding of wrongdoing, civil conspiracy or a breach of fiduciary obligation, the court incorrectly imposed a constructive trust on the automobile in the possession of Amelia Schock. Additionally, they challenge the monetary judgments entered against Angelina Minutola as an error of law, arguing that the court should have imposed an equitable lien instead.

## X. Standard and Scope of Review of a Remedy

 Whether or not an equitable remedy exists or is applied using the correct standards is an issue of law and reviewed *de novo*.[73] Determinations of fact and application of those facts to the correct legal standards, however, are reviewed for an abuse of discretion.[74]

## XI. Restitution and Constructive Trusts

 Angelina Minutola, the mother of Irma Schock, asserted that it was improper to hold her jointly liable with Irma, because the original transfer placing $140,-398 in a joint brokerage account titled in the names of herself and Irma occurred without her knowledge of where the funds came from and the trial court specifically found that Minutola was not a wrongdoer. They assert that because Ms. Minutola was not a "conscious wrongdoer", or an "innocent convertor", or a "gratuitous transferee" she can not be required to pay restitution. Additionally, Ms. Minutola asserts that because she has removed her name from the brokerage account and has not received any benefit from the account, she is innocent and should be dismissed from this action as requested in her motion to modify judgment which is pending in the court below. The issue of whether the judgment should be modified is not before us.

 For a court to order restitution it must first find the defendant was unjustly enriched at the expense of the plaintiff.[75] "Unjust enrichment is defined as 'the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience.'"[76] To obtain restitution, the plaintiffs were required to show that the defendants were unjustly enriched, that the defendants secured a benefit, and that it would be unconscionable to allow them to retain that benefit.[77] Restitution is permitted even when the defendant retaining the benefit is not a wrongdoer.[78] "Restitu-

71. *Nash v. Schock*, Mem. Op. at 20.

72. *Nash v. Schock*, Del.Ch., C.A. No. 14721-NC (June 11, 1998) (ORDER).

73. *See Hogg v. Walker*, Del.Supr., 622 A.2d 648, 654 (1993); *Emmons v. Hartford Underwriters Ins. Co.*, Del.Supr., 697 A.2d 742, 744 (1997).

74. *Hogg v. Walker*, Del.Supr., 622 A.2d 648, 654 (1993) ("[T]he trial court has broad latitude to exercise its equitable powers to craft a remedy."). There is other support that Delaware courts intend to review determinations whether to award equitable remedies for an abuse of discretion. For example the Court of Chancery's decision whether to award in-terest, to what extent, and at what rate is reviewed for an abuse of discretion. *See Shell Petroleum, Inc. v. Smith*, Del.Supr., 606 A.2d 112, 117 (1992); *Summa Corp. v. Trans World Airlines, Inc.*, Del.Supr., 540 A.2d 403, 409 (1988), *cert denied*, 488 U.S. 853, 109 S.Ct. 140, 102 L.Ed.2d 112 (1988).

75. *Fleer Corp. v. Topps Chewing Gum, Inc.*, Del.Supr., 539 A.2d 1060, 1062 (1988).

76. *Id.* (quoting 66 Am.Jur.2d *Restitution and Implied Contracts* § 3, p. 945 (1973)).

77. *Id.* at 1063.

78. *Id.*

tion serves to 'deprive the defendant of benefits that in equity and good conscience he ought not to keep, even though he may have received those benefits honestly in the first instance, and even though the plaintiff may have suffered no demonstrable losses.' "[79]

Although in February 1998, before the trial court issued its Final Order, Ms. Minutola transferred all her interest in the brokerage accounts to Irma, this is of no assistance to her. That transfer occurred after the trial court ruled that all the defendants were required to return all traceable assets.[80] Ms. Minutola should have transferred her interest in the property to the estate or to the court, not to her daughter. Ms. Minutola received a property interest in the brokerage accounts when the accounts were titled jointly with Irma Schock. It is, therefore, not relevant that Minutola did not actually use any of the funds in the account.[81]

Because the judgment was joint and severable, the plaintiffs have the right to seek satisfaction from Ms. Minutola without first attempting to have the judgment satisfied from Irma Schock. Of course the plaintiffs are only entitled to recover the full amount of their judgment. If Minutola is forced to satisfy any part of the judgment she may be able to seek repayment from Irma Schock, but that issue is not before us.

▮▮▮▮ Amelia Schock, the daughter of Irma, asserts that it was an error of law to award restitution against her because she was an "innocent converter" and that the appropriate remedy would have been to place an equitable lien on the 1994 Ford in

her possession. For the same reasons addressed above regarding restitution and Minutola, these arguments are without merit and are rejected.

▮▮▮▮ Amelia also asserts that it was improper to award restitution against her because Irma Schock used the 1994 POA merely to correct an oversight. Ms. Dever apparently executed a document to cash in her annuity and in error the account number was left off. The document was not returned until Ms. Dever was incapacitated in the hospital. Irma asserts that she used the 1994 POA to fulfill Ms. Dever's wishes to have the beneficiary of the annuity changed to Amelia. As evidence of this intent, Amelia points out that Ms. Dever had another annuity for approximately the same amount that she changed the beneficiary from the University to Andrew Schock, Amelia's brother. The trial court made a factual determination that is supported by the record in not upholding this transfer. Although Amelia points to the document signed by Ms. Dever cashing in the annuity, it shows a complete surrender of the annuity and does not express that this was done for the benefit of Amelia. Additionally the only evidence referring to Amelia was the testimony of Irma Schock and the new Penn Mutual application signed by Irma after Ms. Dever became incapacitated. The trial court's factual findings, therefore, will not be disturbed because they are based on determinations of credibility and are supported by the evidence.

Amelia Schock also asserts that it was an error of law to impose a constructive

---

79. *Id.*

80. *Nash v. Schock*, Mem. Op. at 20 (dated December 3, 1997 ordering that the Schocks return to Anna M. Dever's estate any property in their possession that was transferred by Irma Schock).

81. On July 24, 1998, Irma filed an accounting showing the majority of the withdrawals from the mutual fund accounts were for the benefit of her household, loans to Woldemar's business, payments to Irma's lawyer, payment of Amelia's tuition, and that no funds were used by Ms. Minutola. We note that while the interests of Ms. Minutola, the elderly mother of Irma, may be adverse to Irma's husband and daughter, she is represented by the same attorney representing them. If this is a legitimate concern, it can be addressed by the Court of Chancery when it considers Ms. Minutola's pending motion to modify judgment.

trust on the 1994 Ford. Because the proceeds of the constructive trust placed on the annuity that was illegally cashed in by Irma Schock were used to purchase the automobile, this argument is without merit.

Woldemar Schock, the husband of Irma, asserts that the award of restitution against him was an error of law because the amounts in issue were loans made by Irma Schock to him for his businesses. He contends that the trial court contradicts itself in its July 23, 1998 opinion when it calls the loans a "charade" because it previously stated in its Memorandum Opinion dated December 3, 1997, that there was no wrongdoing in the secondary transactions. Woldemar argues that because this finding is not supported by the record and is not the product of an orderly and logical deductive reasoning process the monetary judgments against him should be reversed. He asserts that because the amount in question ($69,000) was in the form of loans to his business corporation and that he has already repaid about $45,000 to Irma, the award of restitution in the amount of $73,366.36 is unjustified and not supported by the record.

Woldemar's argument that the trial court's award of damages against him is inconsistent with its findings in its earlier memorandum opinion is without merit. In its later opinion, the trial court made it clear that it was implied in its earlier opinion that "Woldemar wrongfully enriched himself by knowingly aiding Irma's breach of fiduciary duty." [82] The court noted that it based its award of restitution on "Woldemar's actual notice, his cooperation, and his potential unjust gain from this wrongdoing." [83] Woldemar's arguments that the court should consider the fact that the exchanges of money was not a gift but loans that he has already partially repaid to Irma is without merit. Woldemar benefited from the complete amount he received and the funds should have been paid back to the Estate or to the Court instead of to his spouse, Irma.

The court made determinations of credibility and rejected Woldemar's explanations. Determinations of credibility will be given substantial deference. [84] The trial court determined that Woldemar knew of the source of the funds and it rejected his testimony. The trial court's decision is the product of an orderly and logical deductive process and supported by the record; therefore, the trial court did not abuse its discretion and its award of damages is therefore affirmed.

The judgment of the Court of Chancery is therefore **AFFIRMED** and this matter is **REMANDED** to the Court of Chancery for consideration of the pending motion to amend the judgment.

**82.** *Nash v. Schock,* Del.Ch., C.A. No. 14721–NC, 1998 WL 474161 (Jul. 23, 1998), Letter Op. at 7.

**83.** *Id.* at 6.

**84.** *Cinerama, Inc. v. Technicolor, Inc.,* 663 A.2d at 1180; *Nixon v. Blackwell,* 626 A.2d at 1378 n. 16.