**Archibald W. LINGO, Plaintiff Below, Appellant,**

v.

**Dinah H. LINGO, Defendant Below, Appellee.**

**No. 713, 2009.**

Supreme Court of Delaware.

Submitted: April 7, 2010.

Decided: June 10, 2010.

Corrected: June 24, 2010.

---

42. *Id.*

Daniel V. Folt (argued), Matt Neiderman, and G. Wesley Quinton of Duane Morris LLP, Wilmington, Delaware, for appellant.

Richard A. Zappa (argued), Joseph M. Nicholson and Lauren Hudecki of Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware, for appellee.

Before STEELE, Chief Justice, BERGER and JACOBS, Justices.

STEELE, Chief Justice:

Archibald, "Archie," W. Lingo appeals from a Court of Chancery judgment ordering restitution from and requiring his sister, Dinah Lingo, to return funds she misappropriated as their mother's (Eleanor) attorney-in-fact.[1] Archie suggests that a fairer result would be to require Dinah to return all misappropriated funds to the Trust and not to Eleanor's estate. Archie further contends that in addition to restitution, the Vice Chancellor should have imposed equitable forfeiture and decreased Dinah's inheritance by the amount she misappropriated. Dinah responds by asserting that restitution sufficiently remedies her wrongful conduct. Because restitution adequately restores the amount of the loss and equitable forfeiture conflicts with Eleanor Lingo's testamentary intent, we find that the Vice Chancellor correctly declined to impose the latter remedy. Accordingly, we **AFFIRM** the Court of Chancery's judgment.

### Factual Background and Procedural History

William and Eleanor Lingo owned and operated Lingo's Market, a Rehoboth Beach landmark located on Baltimore Avenue. During their marriage, the couple acquired numerous properties in or near Rehoboth Beach and managed the properties as part of a rental business known as Lingo Brothers. William and Eleanor

---

1. We will refer to the parties by their first names.

held all ownership in the real property as tenants in common. In 1979, William and Eleanor created mirror testamentary plans, under which the testator's one-half interest in the property would pour into a testamentary trust upon the death of the testator. The trust provided income to the surviving spouse for life and terminated on the surviving spouse's death. The remainder of the trust corpus passed in equal shares to the couple's two adult children, Archie and Dinah.

William Lingo died in 1981. In accordance with his testamentary plan, his one-half interest in the rental property and other assets transferred into a trust. Eleanor owned the residual one-half interest in the property. Although the instrument named Archie and Dinah as trustees, Eleanor managed the rental properties alone until 2000. In 2001, Dinah moved into her mother's home and began assisting her with the rental properties. In August 2002, Eleanor contacted her attorney and instructed him to create a new will that disinherited Archie and named Dinah sole beneficiary. Eleanor also instructed him to prepare a power of attorney, naming Dinah her attorney-in-fact. After Eleanor signed the power of attorney, Dinah assumed control of Lingo Bros. and ultimately transferred property and hundreds of thousands of dollars from Eleanor's personal estate either into her own name or into joint accounts with right of survivorship.

During this time, Eleanor developed health problems requiring hospitalization. Eleanor's medical records noted that at times she appeared confused. Over time, several doctors opined that Eleanor suffered from dementia and/or Alzheimer's disease. Archie initiated guardianship proceedings and alleged that Dinah took advantage of Eleanor's diminished mental capacity and violated her fiduciary duties as attorney-in-fact by engaging in self-dealing transactions that resulted in an enormous shift of wealth from Eleanor to Dinah. Archie also challenged the validity of Eleanor's 2002 will disinheriting him.

During the proceedings, Archie conceded, and a Master in Chancery ultimately concluded, that insufficient evidence existed to establish that Eleanor lacked the requisite mental capacity at the time she signed the 2002 will. The Master also invalidated Dinah's power of attorney and appointed an attorney to serve as guardian of Eleanor's property and a professional agent to serve as Eleanor's personal guardian. After hearing oral argument on the issues raised in the action, the Master concluded that Dinah had acted as a faithless fiduciary and, as a result, voided numerous transactions in which Dinah had engaged. The Master ordered an accounting of the income and management of the rental property business and directed Dinah to return the amounts she converted through the power of attorney.

On March 5, 2009, Archie filed a Notice of Exceptions to the Master's Final Report. Archie requested that the Court of Chancery amend the report and order Dinah to return the misappropriated assets to the Trust—not to Eleanor. Archie also requested that Dinah's portion of the Trust be decreased by the amount of those assets. The Vice Chancellor, declining to modify the remedy, affirmed the Master's report and entered a final order consistent with the report. This appeal followed.

## Standard of Review

"Whether or not an equitable remedy exists or is applied using the correct standards is an issue of law and reviewed *de novo*. Determinations of fact and application of those facts to the cor-

rect legal standards, however, are reviewed for an abuse of discretion."[2]

### Discussion

 A person who signs a power of attorney creates a common law fiduciary relationship. To honor that relationship, the attorney-in-fact must observe the duty of loyalty by acting in the best interest of the principal.[3] Failure to do so may result in a breach of trust. Generally, should a breach occur, it should be remedied with two objectives in mind: (1) to render whole both the beneficiary and the estate;[4] and, (2) to prevent the trustee from profiting from his wrongful conduct.[5]

 Delaware courts have long recognized that restitution is the appropriate remedy to meet those objectives and to redress a breach of fiduciary duty where a party is unjustly enriched at the expense of another.[6] Apart from reimbursement, restitution also serves to deprive the wrongdoer of any profits made as a result of his or her conscious, wrongful conduct.[7] Despite the well established remedies of restitution to cure the unfaithful conduct that occurred here, Archie contends that the Vice Chancellor erroneously failed to modify the Master's ruling and craft a new remedy that would require Dinah to forfeit part of her inheritance.

Because equitable forfeiture may disincentivize the disloyal conduct of a fiduciary by preventing him from becoming the ultimate beneficiary of the fruits of his transgressions, under different circumstances Archie's requested remedy might have merit. Here, however, no Delaware precedent exists for using such an extraordinary remedy to rectify the bad behavior of an attorney-in-fact who is also the sole beneficiary under a will. Recognizing the lack of Delaware precedent, Archie claims that persuasive authority exists elsewhere that justifies the relief he seeks. To support this contention, Archie relies primarily on two cases: *Johnson v. Johnson*[8] (a Wisconsin case) and *In re Estate of Newman*[9] (an Arizona case).

In *Johnson*, a mother executed a will that provided for equal distribution of her estate to her children: Janet, Jean, Scott, and Elizabeth.[10] After the mother had surgery, she moved in with Jean and transferred $203,000 to Jean.[11] Of the $203,000, Jean spent $63,000 to purchase a small farm to safeguard her mother's animals.[12] The trial judge allowed Jean to keep the $63,000 but ordered her to return the remainder, which operated as an equitable forfeiture of $63,000—her one-quarter share of the mother's estate.[13]

2. *Schock v. Nash*, 732 A.2d 217, 232 (Del. 1999).

3. See *Schock*, 732 A.2d at 224–25; *Stegemeier v. Magness*, 728 A.2d 557, 563 (Del.1999).

4. See *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1146 (Del.Ch.1994); *Reed v. Delaware Trust Co.*, 1996 WL 255903, at *2 (Del. Ch. May 7, 1996).

5. ULA Trust Code Art. 10 § 1002(a)(2) (2000).

6. See *Schock*, 732 A.2d at 232; *Highlands Ins. Group, Inc. v. Halliburton Co.*, 852 A.2d 1, 8 (Del.Ch.2003).

7. *Pike v. Commodore Motel Corp.*, 1986 WL 13007, at *3 (Del.Ch. Nov. 14, 1986).

8. 1997 WL 534340 (Wis.Ct.App. Sept. 2, 1997).

9. 219 Ariz. 260, 196 P.3d 863 (App.2008).

10. 1997 WL 534340, at *1.

11. *Id.*

12. *Id.* at *2.

13. *Id.* at *3.

In *Estate of Newman,* Celia Newman (a mother of three children: Ilana, Adina, and Mordecai) executed a will that appointed Adina personal representative of the estate.[14] Celia also appointed Adina and Ilana trustees of her trust before her death. After learning of several questionable financial transactions between Celia and Mordecai involving over $350,000, Adina sued Mordecai for breach of fiduciary duty.[15] The trial judge ordered Mordecai to forfeit the benefits he would have received under Celia's will.[16] Because Celia's estate also poured over into her trust, the trial judge found that Mordecai forfeited all benefits accruing from the trust as well.[17]

Although Archie correctly contends that both cases support an equitable forfeiture remedy, he overlooks that the trial judge in *Johnson* purposely fashioned that remedy to honor the mother's testamentary intent. If retaining the $63,000 had not operated as an equitable forfeiture, Jean would have inherited twice as much as the other three children. That outcome would have directly conflicted with the testatrix's wish that each of her children receive one-fourth of her estate. Furthermore, in *In re Estate of Newman,* the trial judge awarded equitable forfeiture under A.R.S. § 46–456, an Arizona statute that, given its plain meaning, *mandates* an automatic forfeiture of all benefits in the decedent's estate once a breach of fiduciary duty occurs.[18] No such statute exists in Delaware.

Even if we could fashion such a remedy at common law, we—not unlike the trial judge in *Johnson*—must also consider the impact of that remedy on Eleanor's testamentary intent.[19] In 2002, Eleanor changed her will and disinherited Archie. Archie having conceded that insufficient evidence existed to establish that Eleanor lacked testamentary capacity, we must conclude that Eleanor possessed testamentary capacity at the time she signed the will. Imposing the theoretical remedy of equitable forfeiture here and stripping Dinah of her inheritance would conflict with Eleanor's clearly expressed testamentary intent. The requested remedy would result in Archie—the disinherited son—receiving an unwarranted bequest that would otherwise flow through probate to Dinah alone. Although Archie's forfeiture remedy has superficial punitive appeal, it is untenable because it would require us to revisit Eleanor's testamentary intent and to rewrite her will.

Archie further contends that equitable forfeiture strikes a better balance between wrongdoing and testamentary intent because restitution fails to address Eleanor's lost mental capacity to appreciate and remedy Dinah's improper conduct. The Vice Chancellor aptly observed that despite Eleanor's previous history of disinheriting Archie for less than exemplary behavior, no evidence suggests that Eleanor would have reversed her testamentary intent to address Dinah's behavior. Indeed, in Eleanor's mind, Dinah's role as Eleanor's caregiver may have countered Dinah's faithless conduct.

One can speculate that Eleanor might have disinherited Dinah and designated

---

14. 196 P.3d at 866.

15. *Id.* at 867.

16. *Id.*

17. *Id.*

18. *Id.* at 872.

19. *See Fiduciary Trust Co. v. Fiduciary Trust Co.,* 445 A.2d 927, 930 (Del.1982); *Dutra de Amorim v. Norment,* 460 A.2d 511, 514 (Del. 1983); *Chavin v. PNC Bank,* 816 A.2d 781, 783 (Del.2003).

Archie as her sole beneficiary upon learning of her daughter's devious deeds. Eleanor might have restored Archie as a part heir—or she might very well have disinherited both children, leaving her wealth to a well-deserving organization. While Dinah's conduct is not commendable, it is important to note that the benefit Dinah ultimately receives results from Eleanor's testamentary intent and not her faithless acts.

Because restitution and disgorgement adequately remedy Dinah's faithless conduct without disturbing Eleanor's testamentary intent, the Vice Chancellor did not err by refusing to impose equitable forfeiture. Accordingly, we uphold the remedy crafted by the Master and affirmed by the Vice Chancellor.

### Conclusion

For the foregoing reasons, we **AFFIRM** the Court of Chancery's judgment.