COURT OF CHANCERY
OF THE
STATE OF DELAWARE

SELENA E. MOLINA
MASTER IN CHANCERY

LEONARD L. WILLIAMS JUSTICE CENTER
500 NORTH KING STREET, SUITE 11400
WILMINGTON, DE 19801-3734

Final Report: September 13, 2022
Draft Report: August 31, 2022
Date Submitted: May 9, 2022

Brian J. Ferry, Esquire
Ferry Joseph, P.A.
1521 Concord Pike, Suite 202
Wilmington, DE 19801

David N. Rutt, Esquire.
Moore & Rutt, P.A.
122 W. Market St.
Georgetown, DE 19947

> Re:  *Tina Renee Rambo v. Kimberly S. Fischer*
> C.A. No. 2022-0161-SEM

Dear Counsel:

The allegations in this action are concerning. The petitioner avers that the respondent, a former teacher, set out to befriend and manipulate two remarkable, elderly women into giving her great power over their lives and estates. These actions, per the petitioner, netted the respondent millions of dollars. But as concerning as this tale may be, the petitioner has failed to state a viable claim for which relief can be granted. The primary reason: she waited too long. "There is a special public policy in favor of prompt settlement of decedent's estates."[1] This policy is evident in the clear, strictly construed time limitations for challenging a decedent's will or trust. The petitioner missed those deadlines and the bulk of her

---

[1] *Criscoe v. Derooy*, 384 A.2d 627, 629 (Del. Ch. 1978).

claims amount to impermissible collateral attacks on the final wishes reflected therein. Those uncontestable wishes mean the petitioner also lacks standing to pursue claims that the respondent breached her duties as power of attorney or should otherwise be required to account for her actions as agent thereunder. For these reasons, I find the petition should be dismissed in full with prejudice.

## I.    BACKGROUND[2]

This dispute concerns the estate of Ellan Levitsky Orkin (the "Decedent"). The Decedent lived a long life; she passed on November 20, 2019 when she was 99 years old.[3] Around twenty (20) years before her death, she became acquainted with Kimberly S. Fischer (the "Respondent").[4] The Decedent's cousin and niece by marriage, Tina Renee Rambo (the "Petitioner") challenges this relationship, and the Respondent's motivations and conduct, through this action.[5] But before I address that challenge, I begin with the relevant touchpoints in the Decedent's long life, cognizant that no report could do such an extraordinary woman justice.

---

[2] Unless otherwise noted, the facts recited herein are taken from the petition. Docket Item ("D.I.") 1.

[3] D.I. 1 ("Pet.") ¶ 1.

[4] *See id.* ¶ 3.

[5] The Respondent questions the familial connection between the Petitioner and the Decedent, but I must accept the Petitioner's well pled allegations as true. D.I. 8, p.2.

The Decedent, and her sister Dorothy Levitsky Sinner ("Dorothy"), served as registered nurses in the United States Army Nurse Corp during World War II.[6] They served in combat zones, including on D-Day in Normandy, France in June of 1944.[7] In recognition of their service, they were honored at the D-Day Memorial Celebration in Normandy in June 2012, and each received the French Legion of Honor Medal in Washington, D.C. in September 2012.[8]

After their service, the Decedent and Dorothy married Benjamin Orkin and George Washington Sinner, respectively, and settled in Milford, Delaware.[9] Tragically, both women were predeceased by their husbands.[10] Widowed and without children of their own, the Decedent and Dorothy shared a close relationship

---

[6] *Id.* ¶ 16. The Decedent had another sister, Molly Levitsky, who I presume was no less remarkable. *Id.* ¶ 8.

[7] *Id.* ¶ 16. *See* Anthony J. Gaughan, *Collateral Damage and the Laws of War: D-Day As A Case Study*, 55 AM. J. LEGAL HIST. 229, 233–34 (2015) ("The largest amphibious invasion in history, D-Day was the dramatic climax of the Second World War. On June 6, 1944, 150,000 American, British, and other Allied soldiers crossed the English Channel and stormed the Nazi-occupied Normandy beaches along the French coastline. The success of the D-Day landings enabled Allied armies to expel the German army from France, Belgium, and Holland. Within 11 months of D-Day, Allied armies invaded Germany itself and brought down Adolf Hitler's Nazi regime. D-Day was thus a vital turning point in history.") (citations omitted).

[8] Pet. ¶ 17.

[9] *Id.* ¶¶ 10-11.

[10] *Id.* The Decedent's husband passed in November of 1995 and Dorothy's in April of 2003. *Id.*

with each other and with many friends, cousins, nieces, and nephews.[11]  One such cousin was the Petitioner who lived kitty-corner from the Decedent.[12]  Their proximity and long-standing relationship allowed daily visits.[13]

Around 1998, the Decedent and Dorothy were introduced to the Respondent.[14] The Respondent had recently left her teaching position at Delaware Technical and Community College and formed ElderAssist, Inc.[15]  The Respondent, knowing that the Decedent and Dorothy were "wealthy, retired individuals without any children[,]" presented business opportunities to them and offered to assist them with their everyday needs.[16]  The Petitioner avers the Respondent had ulterior motivations for doing so: "Her intention from the beginning was to ingratiate herself into these wealthy families, instill herself as an 'adopted daughter', and eventually gain control of their significant wealth."[17]

---

[11] *Id.* ¶ 13.

[12] *See id.* ¶ 15.

[13] *Id. See also id.* (explaining that the Decedent held the Petitioner "in her arms right after [the Petitioner] was born").

[14] *Id.* ¶ 18.

[15] *Id.*

[16] *Id.* ¶ 19.

[17] *Id.* ¶ 20.

The Petitioner further avers that the Respondent succeeded. This success is measured by the Decedent's estate planning activities and the changes she made as she grew closer with the Respondent. Between 2002 and 2017, the Decedent executed twenty-five (25) estate planning documents.[18] The first, a last will and testament dated September 18, 2002 (the "First Will"), in pertinent part, directed the residue of the Decedent's estate (after $40,000.00 in specific bequests), in equal shares, to five individuals, including the Petitioner (listed as her niece) and the Respondent (listed as a friend).[19] The Petitioner does not contest the First Will or two codicils the Decedent executed in 2002.[20]

The first sign of trouble, per the Petitioner, was a handwritten codicil executed on March 5, 2003.[21] Therein, the Decedent replaced the original recipient of a $10,000.00 specific bequest (a synagogue) with the Respondent.[22] Then, on May 6,

---

[18] *Id.* ¶ 31.

[19] Pet. Ex. A.

[20] *See* Pet. ¶ 34. The codicils removed a residuary beneficiary and added an additional specific bequest for Dorothy. Pet. Ex. B.

[21] Pet. ¶ 34, Ex. C. The Petition only attaches the handwritten codicil dated May 6, 2003, not the codicil dated March 5, 2003. Thus, I rely solely on the averments in the Petition regarding the effect of the March codicil.

[22] *Id.*

2003, the Decedent executed another handwritten codicil replacing her named successor executor (her family attorney) with the Respondent.[23]

In late 2003, the Respondent took the Decedent to the Respondent's attorney and additional changes were made to the Decedent's estate planning.[24] On December 11, 2003, the Decedent executed a revocable trust, naming the Respondent and Dorothy as co-trustees, with the Respondent's attorney as successor (the "Trust").[25] The Trust originally made a number of specific bequests, including $100,000.00 to Dorothy and $10,000.00 to the Respondent; the residue was then directed to a number of individuals including the Petitioner (15%) and the Respondent (15%).[26]

The Trust was amended six (6) times before being completely restated in 2012, and again in 2013. All the pre-restatement amendments were to the specific bequests.[27] With her third amendment to the Trust, the Decedent also executed a

---

[23] Pet. Ex. C. The intent behind the codicil is a bit unclear because the Decedent referred to the successor executor as her executor, despite the First Will's appointment of Dorothy to that role. Pet. Ex. A. Although Dorothy did predecease the Decedent, she did not pass until 2015, long after this change. *See* Pet. ¶ 25.

[24] Pet. Ex. C.

[25] Pet. Ex. D.

[26] *Id.*

[27] *See* Pet. Ex. E-J.

new will on June 6, 2006 (the "Second Will").[28]  The Second Will, which was a pour-over will into the Trust, named Dorothy and the Respondent as co-executrixes and the Respondent's attorney as successor.[29]  With the Second Will and third amendment to the Trust, the Respondent became "the largest beneficiary" of the Decedent's estate.[30]

Between 2012 and 2017, the Decedent executed numerous new wills and restated trusts, until the final versions signed on April 18, 2017 (the "Final Will" and "Final Restated Trust").[31]  Through the amendments, the Respondent's share was gradually increased from being a 37.5% residuary beneficiary (like the Petitioner) in the September 25, 2012 restated trust, to being the beneficiary of a specific bequest of $250,000.00 and the entire residuary, if she survived the Decedent.[32]  While the Respondent's inheritance increased, the Petitioner argues her inheritance decreased, from her largest expectation of receiving 50% of the residuary, an estimated five to ten million dollars, to a $750,000.00 specific bequest.[33]

---

[28] Pet. Ex. G.

[29] *Id.*

[30] Pet. ¶ 39.

[31] Pet. Ex. W-X.

[32] *Compare* Pet. Ex. M *with* Pet. Ex. X.

[33] *Compare* Pet. Ex. V *with* Pet. Ex. X.  But I agree with the Respondent that the various estate planning documents "show there were increases and decreases of the gifts to [the

The Petitioner alleges similar changes were made to Dorothy's estate planning. Dorothy moved into the Decedent's home in 2003, after Dorothy's husband passed, and remained there until her death on December 22, 2015.[34] Dorothy's last will likewise appointed the Respondent as executrix and poured over into a trust, for which the Respondent served as successor trustee.[35]

The Petitioner avers that the changes to the Decedent's and Dorothy's estate planning were made through coercion. Specifically, the Petitioner pleads the Respondent

> indicated that she was not close to her own mother and that she would not inherit from her own family, and asked [the Decedent] and Dorothy if she could be part of their family instead. [The] Respondent convinced [the Decedent] that she needed to add [the] Respondent as a beneficiary to her estate planning documents because [the] Respondent did not have a family of her own. [The] Respondent likewise told [the Decedent] on a regular basis that [she] was planning to leave her husband and that she needed to move into [the Decedent]'s house to avoid being homeless. [The] Respondent also told [the Decedent] that she would not inherit anything from her family or from her husband's family, requesting instead to inherit from [the Decedent] and Dorothy.[36]

---

Respondent] just as there were increases and decreases in the gifts to [the Petitioner]." D.I. 8, p. 4 (emphasis in original).

[34] Pet. ¶ 25.

[35] *Id.*

[36] *Id.* ¶ 24.

After Dorothy's death in 2015, the Respondent endeavored to isolate the Decedent from her friends and family members.[37] She allegedly did so with the benefit of a power of attorney the Decedent executed, naming the Respondent as her agent, in March of 2014 (the "POA").[38] Armed with the POA, the Respondent "assumed complete control over" the Decedent's day-to-day life, warning certain friends and family members that they could no longer enjoy a relationship with the Decedent, monitoring the Decedent's mail and phone, installing security cameras in the Decedent's home, and convincing the Decedent she "did not have substantial wealth" despite having "millions of dollars to her name[,]" and that the Decedent, thus, needed to be frugal.[39] Further, during this time, the Respondent "consistently completed financial paperwork in a manner that would place the [Decedent's] assets directly in [the] Respondent's accounts or would otherwise place assets into joint names with [the] Respondent."[40]

The Petitioner avers that the Decedent was susceptible during this time or lacked capacity to engage in estate planning. Her mental and physical decline started

---

[37] *Id.* ¶ 27. The Petitioner does not explain the disconnect between her ability to have near daily visits with the Decedent and the alleged isolation and control by the Respondent. Compare *id.* with *id.* ¶ 15.

[38] *Id.* ¶ 47, Ex. P.

[39] *Id.* ¶ 30.

[40] *Id.* ¶ 91.

around 2010 and "deteriorated majorly after her beloved sister passed away in 2015."[41] After Dorothy's death, the Decedent "was observed often repeating herself, easily becoming upset, crying on a regular basis."[42] From her near daily visits with the Decedent, the Petitioner observed the Decedent "consistently depressed, crying, in pain, repetitive, and incomprehensible."[43] The Petitioner avers the Decedent had frequent urinary tract infections, which led to unusual behavior, had at least one hospitalization around the time of the Final Will and Final Restated Trust, and "often told Petitioner that she did not understand what had happened to her life, that she did not want to live any longer, and that she did not know how she lost control of her finances."[44]

In the last two (2) years of her life, the Decedent did not make any changes to her estate planning, leaving the Final Will and the Final Restated Trust as her final wishes and directives.[45] After the Decedent passed on November 20, 2019, the

---

[41] *Id.* ¶ 101.

[42] *Id.*

[43] *Id.* ¶ 102.

[44] *Id.*

[45] The Petitioner avers "[u]pon information and belief" that the Respondent misled the Decedent, pretending to make the changes the Decedent requested regarding estate planning. *Id.* ¶ 72. After 2017, the Respondent did not allow the Decedent to make any more changes, instructing her that no further changes were allowed. *Id.* ¶ 73.

Respondent took charge of the Decedent's estate, asserting her authority as executrix and trustee.[46] The Petitioner surmises the Respondent ultimately inherited approximately $14 million dollars from the Decedent.[47]

## II.     POSTURE

On February 18, 2022, the Petitioner filed a verified petition to invalidate will and trust agreements, for breach of fiduciary duty, demand for accounting, to invalidate transfers of assets, and for related relief (the "Petition").  The Petitioner states nine (9) counts:[48] (1) a demand for an accounting under 12 *Del. C.* § 49A-116(b)(3) for the Respondent's conduct as agent under the POA or as common law fiduciary from 2014 until the Decedent's death ("Count I"), (2) a request for surcharge for the Respondent's breach of her fiduciary duties as agent under the POA, trustee of the Final Restated Trust, and executrix of the Decedent's estate ("Count II"), (3) a request for invalidation of transfers and retitling of assets by the Respondent due to self-dealing under the POA or undue influence ("Count III"), (4)

---

[46] *Id.* ¶ 55. Letters testamentary were issued to the Respondent on December 3, 2019. D.I. 4, Ex. 1.  The Decedent's estate was closed on December 28, 2020. D.I. 4, Ex. 2.  *See infra* n.56 (taking judicial notice).

[47] Pet. ¶ 55.  The Petitioner avers she "is only able to make educated guesses as to the [e]state and [t]rust assets because [the] Respondent will not reveal any information about the assets." Pet. p.18, n.2.

[48] There appears to be a typographical error in how the counts are numbered within the Petition, which jumps from Count VII to Count IX. *See* Pet. p.29.

a claim that the Respondent breached her fiduciary duties as trustee ("Count IV"), (5) a request to rescind the Final Restated Trust for undue influence or lack of capacity ("Count V"), (6) a request for a constructive trust over the Decedent's assets ("Count VI"), (7) a claim for unjust enrichment ("Count VII"), (8) a claim to invalidate the Final Will and Final Restated Trust for lack of capacity ("Count VIII"), and (9) a claim for undue influence by the Respondent, which resulted in the execution of the Decedent's estate planning documents ("Count IX").[49]

In lieu of answering the petition, the Respondent filed a motion to dismiss on March 15, 2022 (the "Motion").[50] The Petitioner chose to stand on the Petition, rather than amend, and filed an answering brief on April 15, 2022.[51] On May 9, 2022, the Motion was fully briefed and submitted for my consideration, after which I issued a draft report.[52] This is my final report.[53]

---

[49] Count VI and Count V in the Petition are incorrectly titled with Count VI titled as a request to rescind the Final Restated Trust but containing allegations regarding breach, and vice versa. Pet. p.26-27. I have titled the counts herein based on their substance, rather than headings.

[50] D.I. 4.

[51] D.I. 5.

[52] D.I. 8, 9.

[53] This final report makes the same substantive findings and recommendations as my August 31, 2022, draft report, to which no exceptions were filed. D.I. 9.

## III.   ANALYSIS

The Respondent asks that the Petition be dismissed under Court of Chancery

Rule 12(b)(6), the standard for which is settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even
> vague allegations are "well-pleaded" if they give the opposing party
> notice of the claim; (iii) the Court must draw all reasonable inferences
> in favor of the non-moving party; and ([iv]) dismissal is inappropriate
> unless the plaintiff would not be entitled to recover under any
> reasonably conceivable set of circumstances susceptible of proof.[54]

"I need not, however, 'accept conclusory allegations unsupported by specific facts

or . . . draw unreasonable inferences in favor of the non-moving party.'"[55]

Through the Motion, the Respondent argues that the Petitioner's challenges

to the Final Will and Final Restated Trust are untimely, and the Petitioner failed to

state any claim related to the POA.[56]   Although I appreciate the Respondent's

---

[54] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002) (quotation marks and citations omitted).

[55] *In re Straight Path Commc'ns Inc. Consol. S'holder Litig.*, 2018 WL 3120804, at *9 (Del. Ch. June 25, 2018), *aff'd sub nom. IDT Corp. v. JDS1, LLC*, 206 A.3d 260 (Del. 2019).

[56] D.I. 4.  The Respondent attached three documents to the Motion, which the Petitioner argues are outside the scope of my review on a motion to dismiss. D.I. 5. I find I can take judicial notice of the first two documents (the register's order granting letters testamentary to the Respondent and the Register of Wills' approval of the Respondent's first and final account). *See Arot v. Lardani*, 2018 WL 5430297, at *1 n.6 (Del. Ch. Oct. 29, 2018) (citing 12 *Del. C.* § 2501; Del. R. Evid. 202(d)(1)(C)) ("Because the Register of Wills is a Clerk of the Court of Chancery, filings with the Register of Wills are subject to judicial notice."). The third document, a letter from the attorney for the Decedent's estate to the Petitioner sans attachments, does not fall within any exception and has been excluded from

attempt to streamline the Motion by subject matter, I find the Petition is best addressed count-by-count. In doing so, I find the Petition should be dismissed in full, with prejudice.[57]

### A. Count I should be dismissed.

In Count I, the Petitioner seeks an accounting under 12 *Del. C.* § 49A-116, which permits certain interested parties to seek an accounting from an agent under a power of attorney. As explained by Master Ayvazian, "[w]ith one exception, the above statute contemplates petitions for judicial relief from interested persons while the principal is alive. The exception is for cases where the personal representative, trustee or beneficiary of the principal's estate might seek appropriate relief, i.e., an accounting, under Section 49A-114(g)."[58] The Petitioner argues Count I falls within this exception; the Respondent disagrees.

I agree with the Respondent and find Count I should be dismissed. The exception provided under Section 49A-114(g) is limited by its terms to permit a post-death request for an accounting "by the personal representative or successor in

---

consideration. *See In re Gardner Denver, Inc.*, 2014 WL 715705, at *2 (Del. Ch. Feb. 21, 2014) (explaining the limited purposes for which extraneous documents may be considered).

[57] Ct. Ch. R. 15(aaa).

[58] *In re Burke Estate*, 2016 WL 4217752, at *5 (Del. Ch. Aug. 10, 2016), *exceptions denied sub nom. In re Burke* (Del. Ch. 2017).

interest of the principal's estate."[59]  It does not, as the Petitioner argues, require the agent to account to any beneficiary of the estate.[60]  Rather, the limited exception requires an agent to account to the fiduciary of the decedent's estate or, if there is none, to the successor in interest of the decedent's estate.[61]  Because, here, there is a duly authorized executrix and the Petitioner is not the successor in interest, I find she does not have standing to seek an accounting post-death.

### B.   Counts II, III, IV, and VI should be dismissed.

Count II alleges that the Respondent breached her fiduciary duties under the POA, as trustee of the Final Restated Trust, and as executrix of the Decedent's estate.

---

[59] 12 *Del. C.* § 49A-114(g).

[60] To the extent *Burke* stands for the proposition that any beneficiary has such standing, I respectfully disagree. *See Burke*, 2016 WL 4217752, at *5. Although certain interested parties may seek judicial relief related to a power of attorney, the underlying goal is to protect the principal and her interests.  As such, "a principal of a power of attorney has a right to intervene and a qualified right to seek dismissal of an action challenging her power, the latter of which she may only exercise if she has sufficient capacity to do so." *Harker v. Grimes*, 2022 WL 3665050, at *5 (Del. Ch. May 31, 2022) (citations omitted).  It follows, then, when a principal dies, her claims under a power of attorney survive to the fiduciary of her estate. *See also* 10 *Del. C.* § 3701.  It would be inconsistent with the survival statute and the pre-death statutory scheme to permit uncontestable and unlimited beneficiary challenges post-death.

[61] *See Jack Lingo Asset Mgmt., LLC v. Bd. of Adjustment of City of Rehoboth Beach*, 2022 WL 2813781, at *3 (Del. July 19, 2022) ("Our principles of statutory interpretation are well-settled: we aim 'to ascertain and give effect to the intent of the legislators, as expressed in the statute.' If the plain statutory text admits only one reading, we apply it.") (citations omitted). I find the statute is not "reasonably susceptible" of different interpretations and apply it as written, without looking to extrinsic evidence.

Count IV again avers that the Respondent breached her duties as trustee and seeks an accounting. Count III asks that transfers and retitling of certain assets be invalidated because of these breaches and Count VI seeks a constructive trust to protect the related assets.

The Respondent does not address these breach of fiduciary duty claims, nor the requested remedies, separately. The Respondent instead argues that these counts are dependent on time-barred claims to invalidate the Final Will or Final Restated Trust or claims under the POA, for which the Petitioner has no standing. I agree.

Starting with the latter, I find the Petitioner does not have standing to bring claims for alleged breaches of the Respondent's duties under the POA. Under 12 *Del. C.* § 49A-116, certain interested parties can seek judicial relief to "[d]etermine an agent's liability for violation of his or her duties pursuant to § 49A-114". But, as explained above, this "statute contemplates petitions for judicial relief from interested persons while the principal is alive."[62] The power to bring challenges after the Decedent's death rests solely in the Respondent, as the executrix of the

---

[62] *Burke*, 2016 WL 4217752, at *5.

Decedent's estate.[63]   Thus, I find the claims for breach of fiduciary duty as agent

under the POA should be dismissed.[64]

---

[63] *See* 10 *Del. C.* § 3701 ("All causes of action, except actions for defamation, malicious prosecution, or upon penal statutes, shall survive to and against the executors or administrators of the person to, or against whom, the cause of action accrued. Accordingly, all actions, so surviving, may be instituted or prosecuted by or against the executors or administrators of the person to or against whom the cause of action accrued. This section shall not affect the survivorship among the original parties to a joint cause of action."). *Cf. Schock v. Nash*, 732 A.2d 217 (Del. 1999) (addressing post-death claims brought by the decedent's fiduciary and primary beneficiary).

The claim the Petitioner seeks to assert is akin to a derivative claim, made on behalf of the Decedent's estate and the Final Restated Trust, but without proper standing. *See In re Morrow Park Hldg. LLC*, 2022 WL 3025780, at *28 (Del. Ch. Aug. 1, 2022), *as corrected* (Aug. 16, 2022) ("The question of direct versus derivative standing turns on two questions: '(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?'") (quoting *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004)). *See also* 12 *Del. C.* § 1501 ("No one shall act as the executor or administrator of a domiciliary decedent's estate within this State without letters testamentary or of administration being granted in accordance with this title."); *In re Delaware Pub. Sch. Litig.*, 239 A.3d 451, 509-10 (Del. Ch. 2020) (explaining "[t]he issue of standing is concerned 'only with the question of who is entitled to mount a legal challenge and not with the merits of the subject matter of the controversy[;]'" and addressing that "state courts apply the concept of standing as a matter of self-restraint to avoid the rendering of advisory opinions at the behest of parties who are mere intermeddlers.") (citations and quotation marks omitted).

[64] The Respondent argues that the claims related to the POA are also barred by laches. "The equitable doctrine of laches 'prevent[s] someone who slumbers on her rights and delays unreasonably in filing suit from being permitted to prosecute her claims.'" *HUMC Holdco, LLC v. MPT of Hoboken TRS, LLC*, 2022 WL 3010640, at *11 (Del. Ch. July 29, 2022). Ideally, I agree the Petitioner should have moved during the Decedent's life, anytime during the five (5) years the Respondent served as agent, to challenge her authority and actions taken thereunder.  But "in the laches context, '[t]he reasons for the delay are more critical than the amount of time that has elapsed.'" *Zohar III Ltd. v. Stila Styles, LLC*, 2022 WL 1744003, at *9 (Del. Ch. May 31, 2022), *judgment entered*, (Del. Ch. 2022) (citations

The remaining breach claims should also fail. The Petitioner attempts to plead claims for breach of duties the Respondent owed as trustee and executrix. But the Petition does not include any non-conclusory allegations about actions the Respondent took in those roles, to which she was appointed after the Decedent's death, let alone actions that would support reasonably conceivable claims for breach. And, because the Petitioner has failed to state a cognizable claim for breach of the trustee duties, her request for an accounting of the Final Restated Trust must also fail. The Final Restated Trust does not include a beneficiary right to request accounting and, absent such, an accounting is an available equitable remedy only if a breach of trust has been established.[65]

Thus, Counts II, III, IV, and VI should be dismissed for failure to state a claim.

---

omitted). Those reasons are not clear on this limited pleading-stage record. As such, I find laches does not support dismissal.

[65] *See* D.I. 1, Ex. X; *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *11 (Del. Ch. Aug. 26, 2005) ("An accounting is an equitable remedy that consists of the adjustment of accounts between parties and a rendering of a judgment for the amount ascertained to be due to either as a result. As it is a remedy, should the plaintiffs ultimately be successful on one or more of their claims, the court will address their arguments for granting an accounting.") (citations omitted). *Cf.* 12 *Del. C.* § 3581(b)(4).

### C. Counts V, VIII, and IX should be dismissed.

Count V seeks to invalidate the Final Restated Trust for undue influence or lack of capacity. Count VIII and Count IX seek to invalid the legal documents executed by the Decedent between May 2003 and her death for lack of capacity and undue influence, respectively. Although Count VIII and Count IX appear to challenge the Final Will, the Petitioner affirmed in her briefing "the lawsuit challenges the disposition of assets through the [Final Restated] Trust, not through the [Final] Will."[66]

Under 12 *Del. C.* § 3546, there is a limit on when a trust or an amendment to a trust can be challenged.

> A judicial proceeding to contest whether a revocable trust or any amendment thereto, or an irrevocable trust was validly created may not be initiated later than the first to occur of: (1) One hundred twenty days after the date that the trustee notified in writing the person who is contesting the trust of the trust's existence, of the trustee's name and

---

[66] D.I. 5, p.18. I further note any challenge to the Final Will is time-barred notwithstanding the Petitioner's arguments about lack of notice of the probate proceedings and alleged judicial estoppel. Any challenge to the Final Will was due within six (6) months of its entry to probate. 12 *Del. C.* § 1309(a). This statutory bar "is so clear and unambiguous that this Court has consistently declined to permit any tolling or leniency in its limitations period." *In re Chambers*, 2019 WL 1568670, at *2 (Del. Ch. Mar. 26, 2019), *adopted* (Del. Ch. 2019) (citations omitted). "[E]ven fraud does not toll a statute which limits challenges to the validity of a will." *Criscoe*, 384 A.2d at 630. Thus, the attempt to challenge the Final Will filed more than two (2) years after the Final Will was admitted to probate is time-barred. And because the Final Will displaced all prior wills and codicils, there is no viable challenge to those documents. *See also infra* n.68 (addressing the judicial estoppel argument).

address, of whether such person is a beneficiary, and of the time allowed under this section for initiating a judicial proceeding to contest the trust provided, however, that no trustee shall have any liability under the governing instrument or to any third party or otherwise for failure to provide any such written notice. . . . ; (2) Two years after the trustor's death; [or] (3) If the trust was revocable at the trustor's death and the trust was specifically referred to in the trustor's last will, the time in which a petition for review of a will could be filed under this title[.][67]

The Petition does not include any information about when (or whether) the Petitioner was notified under subsection (1). But (2) and (3) clearly bar her claim.[68]

Under (2), the Decedent passed away on November 20, 2019, requiring any challenge to be filed by November 20, 2021. Further, under (3), the Final Will was

---

[67] 12 *Del. C.* § 3546(a).

[68] The Petitioner argues that the Respondent is judicially estopped from raising the time bar because she did not make a timeliness argument in response to a previous contest of the Final Will filed on June 22, 2020. *See Grossman v. Fischer*, C.A. No. 2020-0497-PWG (Del. Ch.) (the "2020 Action"), D.I. 1, 10. "The doctrine of judicial estoppel exists 'to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment.'" *Capaldi v. Richards*, 2006 WL 4782245, at *2 (Del. Ch. Dec. 8, 2006) (citations omitted). "[J]udicial estoppel 'acts to preclude a party from asserting a position inconsistent with a position previously taken in the same or earlier legal proceeding' that the court was persuaded to accept. 'The 'persuaded to accept' element is important [because] parties raise many issues throughout a lengthy litigation and only those arguments that persuade the court can form the basis for judicial estoppel.'" *JPMorgan Chase Bank, N.A. v. Ballard*, 213 A.3d 1211, 1223 (Del. Ch. 2019) (citations omitted). I do not find that the Respondent's failure to invoke the time-bar in the 2020 Action, which was filed around nineteen (19) days after the deadline and dismissed by stipulation before any judicial action was requested, should bar her from asserting the time bar in this action. *See* 2020 Action D.I. 1, 20.

admitted to probate on December 3, 2019, requiring any challenge by June 3, 2020.[69]

The Petitioner initiated this litigation on February 18, 2022. As such, Count V is time barred and should be dismissed.[70]

### D. Count VII should be dismissed.

Count VII is a claim for unjust enrichment. "Unjust enrichment is defined as the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."[71] "Under the standard Delaware formulation of the elements of a claim

---

[69] 12 *Del. C.* § 1309(a) (setting a six (6) month deadline for filing a petition to review a will).

[70] The Petitioner argues, without support, that the statute of limitations should be tolled because the Respondent purposefully hid the Decedent's estate planning documents from the Decedent's friends and family. But I find this fails to explain the Petitioner's inaction. For example, the Petitioner does not aver, nor argue, that the Decedent's death was hidden from her. Rather, she avers that "immediately after [the Decedent] passed away in November 2019, [the Respondent] imposed a lockdown on all of [the Decedent]'s assets and information. Respondent immediately represented herself as the Executrix and Trustee . . . ." Pet. ¶ 22. Thus, the Petitioner knew of the Decedent's death and that the Respondent was asserting her authority as trustee of some estate-related trust. Further, the Final Will was on file with the Register of Wills and explicitly named the Final Restated Trust as the beneficiary of the Decedent's estate. *See In re Orkin*, 19662 ("ROW"), D.I. 2. Even assuming a tolling exception could apply, I find the Petitioner has failed to plead adequate factual support for such. *Cf. DiSabatino v. Diferdinando*, 2001 WL 812014, at *3 (Del. Ch. July 9, 2001) (dismissing a similar suit, purportedly seeking to attack a pour-over trust, rather than the will, finding "this action is a collateral attack on the Will under the guise of a challenge to the Trust. In these circumstances, such a collateral attack is impermissible, and will not be allowed") (citations omitted).

[71] *Schock*, 732 A.2d 217, 232 (citations and quotation marks omitted).

for unjust enrichment, a plaintiff must plead and later prove '(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law.'"[72] But, as recently clarified by Vice Chancellor Laster, "[o]utside of a dispute over jurisdiction, however, it is not necessary for a plaintiff to plead or later prove the absence of an adequate remedy at law."[73]

The Petitioner pleads that the Respondent transferred, gifted, jointly-titled, and otherwise improperly disposed of the Decedent's assets to the detriment of the Decedent's intended heirs. Like the breach of fiduciary duty claims, the Respondent does not individually address this claim, but I agree that it cannot survive because the underlying will and trust contests are time-barred and the Petitioner lacks standing to assert a survival action on behalf of the Decedent.

"There is a special public policy in favor of prompt settlement of decedent's estates."[74] Such is why, for example, the six-month deadline to challenge a will admitted to probate is strictly construed. The Petitioner missed that deadline and

---

[72] *Garfield v. Allen*, 277 A.3d 296, 341 (Del. Ch. 2022) (citing *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010)).

[73] *Id.* at 351.

[74] *Criscoe*, 384 A.2d at 629.

cannot challenge the Final Will directly or collaterally.[75]  Likewise, as explained above, the Petitioner missed her deadline to challenge the Final Restated Trust.  That leaves the Final Will and the Final Restated Trust as the conclusive final wishes of the Decedent.  The Petitioner's claim for unjust enrichment, if permitted to survive, would work an impermissible collateral attack on those final wishes.[76]  It would, likewise, permit a workaround of the limitations on who has standing to bring a survival action on behalf of the Decedent.[77]  Further, with the Final Will and Final Restated Trust uncontestable, the Petitioner cannot state a reasonably conceivable claim that there is an "absence of justification" for the benefit to the Respondent, and corresponding detriment to the Petitioner.  Count VII should be dismissed.

---

[75] *See* D.I. 1; ROW D.I. 2.

[76] "A collateral attack is an attempt to 'avoid, defeat, evade, or deny the force and effect of a final order or judgment in an incidental proceeding other than by appeal, writ of error, certiorari, or motion for new trial.'" *In re Vale*, 2015 WL 721038, at *4 (Del. Ch. Feb. 19, 2015) (citations omitted). It includes an attack on the finality of estate planning documents. *See Moore v. Graybeal*, 1988 WL 117320, at *2 (Del. Oct. 28, 1988) (finding a claim for tortious interference with an inheritance would be an impermissible collateral attack upon the probate of a will, which "is clearly precluded by Delaware law") (citing *Criscoe*, 384 A.2d at 630-31; *Anthony v. Harris*, 100 A.2d 229, 232 (Del. Ch. 1953)); *DiSabatino v. Diferdinando*, 2001 WL 812014, at *3 (finding "this action is a collateral attack on the Will under the guise of a challenge to the Trust. In these circumstances, such a collateral attack is impermissible, and will not be allowed") (citations omitted).

[77] *See supra* n.60, 63 (addressing the statutory scheme for survival actions).

## IV.    CONCLUSION

For the above reasons, the motion to dismiss should be granted and the Petition dismissed in full, with prejudice. Most of the Petitioner's claims are either expressly time barred or seek a collateral attack on the Decedent's uncontestable final wishes. There is no viable basis for tolling the applicable limitations or permitting the Petitioner a workaround. More compelling is the need for finality in the Decedent's estate. The only claims outside this bucket relate to the POA. But as explained herein, I find the Petitioner does not have standing to assert such claims at this time.

This is my final report and exceptions may be filed under Court of Chancery Rule 144.

Respectfully submitted,

/s/ *Selena E. Molina*

Master in Chancery