# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ANDREA BENSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2024-1022-BWD |
| | ) | |
| CHAD HUGGINS, | ) | |
| | ) | |
| Defendant. | ) | |

## POST-TRIAL MEMORANDUM OPINION

Date Submitted: December 5, 2025
Date Decided: January 21, 2026

William M. Lafferty, Ryan D. Stottmann, C. Isaac Hopkin, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; Lesley F. Wolf and Avery Jue Meng, BALLARD SPAHR LLP, Wilmington, DE; *Attorneys for Plaintiff Andrea Benson*.

Gary E. Junge, SCHMITTINGER & RODRIGUEZ, P.A., Dover, DE; *Attorneys for Defendant Chad Huggins*.

**DAVID, V.C.**

In 2014, while the plaintiff and the defendant in this action were dating, the defendant purchased a home in Frederica, Delaware, using a VA loan. The plaintiff contends that she wanted to purchase the home for herself but could not qualify for a mortgage. So, according to the plaintiff, the parties orally agreed that the defendant would purchase the home in his name, but the plaintiff would be the equitable owner, assuming responsibility for all expenses associated with the home, and the defendant would transfer title to the home to the plaintiff as soon as she could obtain a mortgage in her own name.

When the parties broke up in early 2017, the plaintiff remained in the home and continued to make payments to the defendant to cover the monthly mortgage. To help the parties move on, the defendant agreed to transfer the home to the plaintiff if she could qualify for a mortgage within two years. The plaintiff failed to secure a mortgage within two years and rebuffed the defendant's repeated efforts to convince her to buy the home, until the defendant took action to evict her, at which point she filed this action, eleven years after the alleged oral agreement and eight years after the parties' breakup.

The plaintiff now seeks an order compelling the defendant to specifically perform his obligations under their alleged oral agreement by selling the home to her for the remaining balance of the mortgage. After a trial, I conclude that the plaintiff has failed to prove the existence of an oral agreement by clear and convincing

1

evidence, and that her related claims for relief likewise fail. Judgment is entered for the defendant.

## I. BACKGROUND

The following facts are as the Court finds them following a one-day trial held on September 24, 2025.[1]

### A. Defendant Purchases The Home With A VA Loan.

Andrea Benson ("Plaintiff") and Chad Huggins ("Defendant") began dating in 2013.[2] At that time, Plaintiff, who lived in a two-bedroom apartment with her niece and nephew in Milford, Delaware,[3] hoped to find a larger home for her family.[4] By late 2013, Plaintiff and Defendant discussed moving in together.[5]

In early 2014, Plaintiff found a listing on Zillow for a house located at 16 E. David Street in Frederica, Delaware (the "Home").[6] Plaintiff and Defendant toured the Home and decided to buy it.[7] Believing Plaintiff would not qualify for a mortgage, Defendant purchased the Home for $132,000 using a VA loan with a

---

[1] The Stipulation and Pre-Trial Order is cited as "PTO ¶ __". Dkt. 42. Trial testimony is cited as "Tr. (Witness) at __". Dkt. 46. Joint trial exhibits are cited as "JX __". Dkt. 45.

[2] PTO ¶ 11; Tr. (Benson) at 8:8–13.

[3] Tr. (Benson) at 18:16–20.

[4] *Id.* at 8:21–24.

[5] *Id.* at 35:21–23.

[6] *Id.* at 8:21–9:3; JX 9 at 2.

[7] Tr. (Benson) at 9:7–24.

thirty-year term (the "VA Mortgage").[8] The VA Mortgage provided 100% financing for the Home without a down payment.[9]

According to Plaintiff, the parties agreed at that time that Defendant would purchase the Home in his name but Plaintiff would be the equitable owner of the Home, assuming responsibility for all expenses associated with the Home, and Defendant would transfer title to the Home to Plaintiff as soon as she could obtain a mortgage.[10] Defendant disputes that the parties agreed to such an arrangement.[11] He contends, instead, that he purchased the Home to live in with Plaintiff, whom he intended to marry.[12]

In June 2014, Plaintiff, with her mother, niece, and nephew, moved into the Home.[13] Defendant moved into the Home after his return from military deployment

---

[8] PTO ¶ 12; Tr. (Benson) at 10:5–20, 12:4–8, 45:17–18.

[9] Tr. (Huggins) at 81:22–82:2.

[10] *Id.* (Benson) at 10:15–20. Plaintiff paid $3,775 in closing costs at closing. *See id.* at 12:9–15; JX 2 at 1 (showing Plaintiff paid $3,275 to Defendant and $500 to ERA Harrington Realty Inc. in 2014); Pl.'s Post-Trial Submission [hereinafter PB] at 5, Dkt. 52. Defendant claims that he paid half of the closing costs as well. Tr. (Huggins) at 85:16–86:6; Def. Chad Huggins' Post-Trial Br. [hereinafter DB] at 19, Dkt. 51.

[11] Tr. (Huggins) at 83:3–19.

[12] *Id.* at 84:3–23 ("I was just trying to purchase a property for the family, because I knew her niece, her nephew, and her mother were coming along with that. So, as a man, I was just trying to provide a place to live."). *But see id.* (Benson) at 58:7–59:10 ("I even at one point kind of expressed, like, how impossible it would be to get me to marry [him], you know. Like, you'd have to swim the Atlantic Ocean and go chisel a rock out of a cave in Egypt or Africa somewhere to get me a lavish pink diamond for me to say yes, so . . . .").

[13] *Id.* at 13:1–7, 56:7–10.

later that year.[14] Plaintiff and Defendant lived in the Home together from 2014 to 2017.[15] They became engaged in 2015.[16] When Defendant refinanced the Home that year, Plaintiff was not a party to the refinancing.[17]

While Defendant resided in the Home, Plaintiff made payments to Defendant to cover half of the $800 monthly VA Mortgage payment and half of the utility bills.[18] During periods when Defendant was deployed and not living in the Home, Plaintiff made payments to Defendant to cover the full amount of the VA Mortgage payment.[19]

### B. The Parties Break Up And Plaintiff Remains In The Home.

The parties' engagement ended and Defendant moved out of the Home by February 2017.[20] Plaintiff and her family members remained in the Home.[21] Plaintiff claims she stayed in the Home "because it was the understanding that it was [her] house."[22] Since 2017, Plaintiff has made payments to Defendant to cover the

---

[14] *Id.* at 13:8–12.

[15] PTO ¶ 15.

[16] Tr. (Benson) at 56:15–21; *id.* (Huggins) at 86:7–9.

[17] PTO ¶ 13.

[18] *Id.* ¶¶ 16–17; Tr. (Benson) at 13:13–14:9.

[19] *Id.* at 14:3–9.

[20] *Id.* at 15:5–10, 59:19–60:22; PTO ¶ 14.

[21] Tr. (Benson) at 15:8–13.

[22] *Id.* at 15:14–19.

VA Mortgage each month and has paid all utility bills.[23]  She also has replaced

appliances and made minor repairs in the Home.[24]

In February 2017, Plaintiff and Defendant met with a mutual friend and

mortgage lender, Ed Rexroth, to come up with a plan for Plaintiff to purchase the

Home so that the parties could move on.[25]  Defendant and Rexroth testified that

during this meeting, Defendant agreed to sell the Home to Plaintiff for the remaining

balance on the VA Mortgage if Plaintiff could purchase the Home from him within

two years—*i.e.*, by February 2019.[26]

Plaintiff did not purchase the Home by February 2019.  In 2018 and 2019,

Plaintiff met with Rexroth to discuss qualifying for a mortgage but was told both

times that her reported earnings from bartending and waitressing did not qualify her

for a loan.[27]

---

[23] *Id.* at 16:6–21.

[24] *Id.* at 17:9–19, 18:5–15, 77:13–20.

[25] *Id.* (Huggins) at 88:5–14.

[26] *Id.* at 88:5–16; *see id.* (Rexroth) at 140:19–21 ("Mr. Huggins agreed that he would give her two years to obtain the mortgage in her name, taking it out of his name."); *see* JX 4 at 1 (Defendant asking Plaintiff in January 2018 if she wanted to "do the house thing in [her] name?"); *id.* at 2 (Defendant asking Plaintiff in February 2018 to start "the process for this house" and Plaintiff responding, "[h]asn't really been in my plans").

[27] Tr. (Benson) at 19:4–20:19.

Even after February 2019, Defendant continued to encourage Plaintiff to apply for a mortgage to purchase the Home from him.[28]  In May 2020, Defendant offered to sell the Home to Plaintiff for $125,000, but Plaintiff did not purchase the Home.[29]  In January 2022, Defendant again offered to sell Plaintiff the Home, this time for $165,000.[30]  Plaintiff went to another lender, Jay Vallon, to apply for a mortgage but was approved for a loan of no more than $80,000.[31]  By October, Defendant believed the Home was worth $230,000, but again offered to sell it to Plaintiff for $165,000 or $170,000.[32]  Again Plaintiff declined.[33]

In 2023, Plaintiff went to another friend and lender, Amanda Facciolo, who approved Plaintiff for a $140,000 mortgage.[34]  When Defendant offered to sell the

---

[28] *E.g.*, JX 12 at 5 ("I want this out of my name one way or another in the next few months . . . it's been to[o] long!"); *id.* at 12–13 ("I [have] been carrying the house in my name . . . you have [until Feb. 1] to let me know what you want to do, either we will get a contract started or you will have 60 days to move out and I'll sell the property . . . ."); *id.* at 13 ("[I]t's time to decide something . . . we are waiting on your W2[]s."); *id.* at 32 ("If you agree, get the mortgage process started[.]"); *id.* at 46 ("How's things looking to buy this house?  Any process movement yet?").

[29] *Id.* at 67; Tr. (Huggins) at 119:6–24.

[30] JX 12 at 4–7, 20.

[31] Tr. (Benson) at 25:10–19.

[32] JX 12 at 38.

[33] *Id.* at 39.

[34] Tr. (Benson) at 25:22–26:4.

6

Home to Plaintiff for $150,000, despite believing the Home was worth $253,000,[35] Plaintiff countered at $140,000.[36]  Defendant did not accept her counter.

In February 2024, Defendant offered to sell the Home to Plaintiff for $200,000, but the parties again failed to reach agreement on a sale.[37]

### C.    Procedural History

In June 2022, Defendant initiated proceedings in Justice of the Peace Court seeking summary possession of the Home.  *Huggins v. Benson*, C.A. No. JP16-22-003342 (Del. J.P. June 3, 2022).  After the Justice of the Peace Court determined it lacked jurisdiction, Defendant filed an ejectment action against Plaintiff in Superior Court.  *Huggins v. Benson*, 2024 WL 4287147 (Del. Super. Sep. 25, 2024).

On October 3, 2024, Plaintiff initiated this action through the filing of a Verified Complaint, raising equitable defenses to Defendant's claim for ejectment.[38] The Court held a one-day trial on September 24, 2025.[39]  Post-trial briefing was completed on December 5.[40]

---

[35] JX 12 at 49, 52, 60.

[36] *Id.* at 62.

[37] JX 17 at 1.

[38] Verified Compl. [hereinafter Compl.], Dkt. 1.

[39] Dkt. 44.  The parties filed pre-trial briefs on September 3, 2025.  *See* Def. Chad Huggins' Pretrial Br., Dkt. 38; Pl.'s Pretrial Br., Dkt. 39.

[40] DB, Dkt. 51; PB, Dkt. 52.

## II.    ANALYSIS

Plaintiff asserts claims against Defendant for breach of contract, promissory estoppel, quiet title, and unjust enrichment.   Plaintiff seeks a declaration that Defendant has breached an oral agreement with Plaintiff, an order of specific performance requiring Defendant to transfer the Home to Plaintiff for the balance of the VA Mortgage, and an order quieting title to the Home in Plaintiff's favor. Alternatively, if the Court determines that Defendant owns the Home, Plaintiff seeks an order requiring Defendant to disgorge amounts by which he has been unjustly enriched.

### A.    Specific Performance

Plaintiff contends that Defendant has breached an oral contract to sell the Home to her for the balance of the VA Mortgage.[41]  Plaintiff seeks an order directing Defendant to specifically perform his obligations under that agreement.[42]

"Specific performance for the transfer of real property is an extraordinary remedy and [Delaware courts] will not award it lightly."  *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010) (first citing *Szambelak v. Tsipouras*, 2007

---

[41] PB at 9, 30–31; Compl. ¶¶ 19–28.

[42] Plaintiff does not assert an alternative request for damages.  *Id.* ¶ 27 ("[M]onetary damages are not an adequate remedy for Defendant's breach of contract.").

WL 4179315, at *1 (Del. Ch. Nov. 19, 2007); and then citing *Morabito v. Harris*, 2002 WL 550117, at *1 (Del. Ch. Mar. 26, 2002)).

> A party must prove by clear and convincing evidence that he or she is entitled to specific performance and that he or she has no adequate legal remedy. A party seeking specific performance must establish that (1) a valid contract exists, (2) he is ready, willing, and able to perform, and (3) . . . the balance of equities tips in favor of the party seeking performance.

*Id.* (footnotes omitted) (first citing *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 834 n.112 (Del. Ch. 2007); then citing *Deene v. Peterman*, 2007 WL 2162570, at *5 (Del. Ch. July 12, 2007); then citing *W. Willow-Bay Ct., LLC v. Robino-Bay Ct. Plaza, LLC*, 2007 WL 3317551, at *12 (Del. Ch. Nov. 2, 2007); and then citing *Morabito*, 2002 WL 550117, at *2). Plaintiff's request for specific performance must be denied because Plaintiff has failed to prove the existence of a valid contract by clear and convincing evidence.

"A valid contract exists when (1) the parties have made a bargain with 'sufficiently definite' terms; and (2) the parties have manifested mutual assent to be bound by that bargain." *Sarissa Cap. Domestic Fund LP v. Innoviva, Inc.*, 2017 WL 6209597, at *21 (Del. Ch. Dec. 8, 2017), *judgment entered*, (Del. Ch. 2017). "A contract is sufficiently definite and certain to be enforceable if the court can—based upon the agreement's terms and applying proper rules of construction and principles of equity—ascertain what the parties have agreed to do." *Eagle Force Hldgs., LLC v. Campbell*, 187 A.3d 1209, 1232 (Del. 2018).

9

Plaintiff argues that when the Home was purchased in 2014, the parties orally agreed that "they would collectively buy the [Home], but that Plaintiff would own the [Home] and that the [Home] would be in Defendant's name until Plaintiff could obtain a mortgage in her name for the remaining balance of the VA [M]ortgage."[43] Plaintiff asserts that under this agreement, Defendant was required to sell the Home to her "as soon as [she] could get the proper financing."[44] Per Plaintiff, the oral agreement did not set a "time period to transfer the [Home,]" such that Defendant's obligation to sell the Home to Plaintiff would remain for the duration of the thirty-year VA Mortgage so long as Plaintiff continued to use her best efforts to obtain financing.[45]

Defendant denies that the parties reached the agreement Plaintiff describes. Defendant says that he purchased the Home in 2014 to live with Plaintiff, not to "purchase a property in his name for another person while taking full responsibility for any property-related issues."[46] Defendant explains that after the parties broke up

---

[43] Pl.'s Pretrial Br. at 7.

[44] PB at 10.

[45] PB at 16; *but see* Tr. (Benson) at 45:19–46:3 ("Q. Okay. If you weren't able to qualify for a mortgage, would this arrangement have gone on for 30 years? A. No, sir, that wasn't the goal. The goal was to show efforts or to have efforts year by year to be approved. I was working towards the approval. I wasn't going to let the loan expire to 30 years and it be owned by Chad Huggins. It was never meant to be in Chad Huggins' name forever.").

[46] DB at 1.

in 2017, he agreed to give Plaintiff two years to purchase the Home for the balance of the VA Mortgage to help the parties move on, but denies any oral agreement existed before that.[47]

After careful review of the record, I find that Plaintiff has failed to prove by clear and convincing evidence that the parties entered into an oral agreement in 2014. Aside from her own self-serving testimony, Plaintiff offers no evidence to support the existence of such an agreement. No contemporaneous documentary evidence exists. Plaintiff's primary argument is that the parties' conduct after 2014 supports the existence of an oral agreement. Plaintiff argues that (1) after the parties' breakup, Defendant did not require Plaintiff to move out of the Home or sign a rental agreement, (2) Defendant has not tried to enter the Home since that time, (3) Plaintiff has made repairs to the Home without Defendant's permission, and (4) communications from 2018 onward show that on certain occasions (including for two years after the parties' breakup), Defendant was willing to sell the Home to Plaintiff for the balance of the VA Mortgage but Plaintiff failed to obtain financing.[48]

---

[47] DB at 30.

[48] Tr. (Huggins) at 88:5–16 ("I was like, hey, I want out of this. I just want to move on with our lives. If you want the house, here is two years to get your stuff together, and I will sell it to you for what's owed on the mortgage. You can have it at that, and let's just move on."); *see* JX 4 at 5 ("Right now like 126k is owed on the house just say it goes to 130 . . . u getting another house for 122k u might save u literally like $2 in payments differences.").

Those facts do not, however, support a finding by clear and convincing evidence that Defendant agreed in 2014 to purchase the Home for Plaintiff's benefit. Instead, the evidence persuades me that after the parties' breakup in 2017, Defendant gave Plaintiff as much grace as he could afford, not because he was contractually bound to do so, but because he did not want to force her and her family out of the Home if he could avoid it.

Even if the parties had orally agreed in 2014 that Defendant would sell the Home to Plaintiff as soon as she could obtain financing, Plaintiff further failed to prove by clear and convincing evidence that the parties intended to be bound for up to thirty years if Plaintiff could not qualify for a mortgage within a reasonable timeframe.[49] Nothing in the record supports a finding that Defendant ever agreed to be obligated to sell the Home to Plaintiff many years after the parties' relationship ended. Defendant represented on the VA Mortgage application that the Home would be his primary residence, suggesting he did not anticipate Plaintiff would remain in the Home for years after the parties' breakup with his name remaining on the VA

---

[49] *See Wolf v. Crosby*, 377 A.2d 22, 27 (Del. Ch. 1977) ("[W]here no time for performance is specified in a contract for the sale of real estate a court will imply a reasonable time[.]"); *Salisbury v. Credit Serv., Inc.*, 199 A. 674, 683 (Del. Super. Ct. 1937) ("[W]here no time for the performance of a contract is fixed by it, the law will assume that a reasonable time is intended.").

12

Mortgage.[50] Plaintiff also offers no convincing explanation for why Defendant would have agreed to give Plaintiff a thirty-year option to purchase the Home from him, assuming the risks of depreciation, nonpayment, and property damage for decades and impeding his ability to purchase another property for himself, while he received little (if anything) in return.[51]

Communications postdating the purported oral agreement show that the parties expected Plaintiff to purchase the Home "as quick as possible," not a decade later.[52] Even when Defendant later agreed to sell the Home to Plaintiff, she took far longer than the parties anticipated to obtain a loan[53]; Defendant repeatedly encouraged Plaintiff to seek financing to avoid removing her family from the Home[54]; Plaintiff frequently rebuffed Defendant's messages[55]; and it was only after

---

[50] JX 7 at 64.

[51] Plaintiff contends that by purchasing the Home, Defendant received "good credit standing," but nothing in the record suggests that is true. Tr. (Benson) at 47:19–48:3 (testifying that Defendant received "a sky-high credit score" and "unclaimed income" through the parties' alleged agreement).

[52] JX 12 at 34 ("Agreement was to get it in your name as quick as possible, not at your leisure . . . ."); *see also id.* at 58 ("9/10 years is long enough to try to help and offer someone something.").

[53] *See, e.g.*, JX 12 at 5 ("I want this out of my name one way or another in the next few months . . . it's been to[o] long!").

[54] *See, e.g.*, JX 4 at 1 (Defendant asking Plaintiff in January 2018 if she wanted to "do the house thing in [her] name?").

[55] *See, e.g.*, JX 4 at 2 (Defendant asking Plaintiff in February 2018 to start "the process for this house" and Plaintiff responding, "[h]asn't really been in my plans").

13

Defendant initiated litigation eleven years after the parties' purported oral agreement and eight years after their breakup that Plaintiff finally obtained financing to purchase the Home.[56]

For these reasons, Plaintiff has failed to prove by clear and convincing evidence that the parties entered into an enforceable oral agreement in 2014 requiring Defendant to sell the Home to her for the balance on the VA Mortgage now.  Plaintiff's request for specific performance is therefore denied.

## B.    Promissory Estoppel

Plaintiff asserts, in the alternative, that she is entitled to relief under the doctrine of promissory estoppel,[57] arguing that Defendant promised she was the equitable owner of the Home.[58]  As a remedy, Plaintiff seeks an order directing Defendant to follow through on his purported promise by conveying the Home to her in exchange for the balance on the VA Mortgage.[59]

"Promissory estoppel involves 'informal promises for which there was no bargained-for exchange but which may be enforceable because of antecedent factors that caused them to be made or because of subsequent action that they caused to be

---

[56] *Id.*; JX 12 at 61–62.

[57] Compl. ¶¶ 29–38.

[58] *Id.* ¶ 31.

[59] *Id.* ¶ 38.

14

taken in reliance.'" *Ramone v. Lang*, 2006 WL 4762877, at *14 (Del. Ch. Apr. 3, 2006) (quoting *Chrin v. Ibrix, Inc.*, 2005 WL 2810599, at *8 (Del. Ch. Oct. 19, 2005)). Promissory estoppel requires a showing of clear and convincing evidence that:

> (1) a promise was made; (2) it was the reasonable expectation of the promisor . . . to induce action or forbearance on the part of the promisee; (3) the promisee . . . reasonably relied on the promise and acted to [their] detriment; and (4) . . . such a promise is binding because injustice will be avoided only by enforcement of the promise.

*Id.*

For the reasons detailed above, the trial record does not support a finding that Defendant promised Plaintiff would be the equitable owner of the Home with a right to purchase it at any time for the balance on the VA Mortgage.[60] Instead, the record shows that Defendant agreed in February 2017 that he would sell the Home to Plaintiff for the balance on the VA Mortgage if Plaintiff purchased it within two years, Plaintiff failed to do so, and thereafter, the parties could not reach agreement on a price.[61] Without a promise to enforce, Plaintiff's promissory estoppel claim fails.

---

[60] *See supra* notes 25–26.

[61] *E.g.*, JX 12 at 20–21 (Defendant telling Plaintiff to "[t]ake it for 165k" and Plaintiff responding, "I'm out!!!"); *id.* at 32 (Defendant again offering the Home for "165/70"); *id.* at 60–62 (Defendant explaining "the price is 150, take it or leave it," and Plaintiff asking, "are [you going] to consider my 140,000").

15

## C. Quiet Title

Count III of the Complaint seeks an order quieting title to the Home in Plaintiff's favor.[62] Plaintiff's briefing abandons this claim,[63] arguing instead that the parties have created a resulting trust.[64]

"A resulting trust is an equitable remedy by which a court of equity may give effect to the intentions of the parties to a transaction." *Hudak v. Procek*, 806 A.2d 140, 146 (Del. 2002). "As a general rule, equity will presume, absent contrary evidence, that the person supplying the purchase money for property intends to retain a beneficial interest in the property and that title is placed in the name of another for some incidental reason." *Id.* A resulting trust "is an equitable remedy designed to prevent unjust enrichment and to ensure that legal formalities do not frustrate the original intent of the transacting parties." *Id.* But as I found above, Plaintiff failed to prove by clear and convincing evidence[65] that the parties intended for Plaintiff to

---

[62] Compl. ¶¶ 39–43.

[63] *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

[64] Pl.'s Pretrial Br. at 13; PB at 31.

[65] *See McKee v. McKee*, 2007 WL 1378349, at *2 n.24 (Del. Ch. May 3, 2007) (holding that the burden to prove a resulting trust is clear and convincing evidence).

be the equitable owner of the Home.[66]  Her request for imposition of a resulting trust must be denied.

### D.     Unjust Enrichment

Finally, Plaintiff argues that if Defendant retains title to the Home, he will be unjustly enriched by "all of the funds and effort expended by Plaintiff in the mistaken belief that she was the equitable owner of the [Home]"[67] and "appreciation in the value of the [Home]."[68]  Plaintiff seeks an order requiring Defendant to disgorge these purported benefits.[69]

"Unjust enrichment is defined as the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."  *Great Hill Equity P'rs IV, LP v. SIG Growth Equity Fund I, LLLP*, 2014 WL 6703980, at \*27 (Del. Ch. Nov. 26, 2014) (quoting *Schock v. Nash*, 732 A.2d 217, 232 (Del. 1999)).  Plaintiff failed to prove that Defendant will be unjustly enriched by retaining title to the Home.  To

---

[66] I note, too, that Plaintiff did not pay a down payment to purchase the Home, and Defendant testified that he paid half the closing costs and covered at least half of the mortgage when he resided in the Home.  Tr. (Benson) at 12:9–15 ("Q. And did you make a down payment?  A. There was no down payment."); *id.* (Huggins) at 86:4–6 ("Q. Okay. So did you pay half the closing costs?  A. Yes."); *id.* at 102:21–22 ("She split [the VA Mortgage] with me, yes.").

[67] Compl. ¶¶ 44–48.

[68] *Id.* ¶ 47.

[69] *Id.* ¶ 48.

the extent Defendant benefited by an appreciation in value, such a benefit is not unjust, as he also bore all of the risk associated with homeownership and a mortgage. Nor has Plaintiff unfairly incurred a detriment. Plaintiff has benefitted tremendously from her arrangement with Defendant, under which she has paid only $800 per month to use the Home since 2014.[70] Plaintiff's request for disgorgement under an unjust enrichment theory is denied.

## III. CONCLUSION

For the reasons explained above, judgment is entered for Defendant.

---

[70] Beyond paying $800 to Defendant to stay in the Home, Plaintiff failed to prove the amounts of other expenses incurred in connection with the Home.